**In the Matter of the CUSTODY OF S.E.G., A.L.W. and V.M.G.**

No. C4–93–1054.

Supreme Court of Minnesota.

Aug. 31, 1994.

Anita P. Fineday, Tribal Atty., Leech Lake Band of Chippewa, Cass Lake, for Leech Lake Band of Chippewa.

Hubert H. Humphrey, III, Atty. Gen., Kim Buechel Mesun, Asst. Atty. Gen., St. Paul, for Commissioner of Human Services.

Timothy R. Faver, Beltrami County Atty., Shari R. Schluchter, Asst. Beltrami County Atty., Bemidji, for Beltrami County.

Charles R. Powell, Powell & Lang, Bemidji, for Guardian ad Litem.

Wright S. Walling, Jody Ollyver DeSmidt, Gary A. Debele, Walling & Berg, Minneapolis, for Eugene Campbell, et al.

Shirley M. Cain, Duluth, for amicus curiae, Red Lake Band of Chippewa Indian.

Jeannice M. Reding, Best & Flanagan, Minneapolis, and James Genia, Sol. Gen., Mille Lacs Band of Ojibwe, Onamia, and Steve C. Moore, Native American Rights Fund, Boulder, CO, for amici curiae, Mille Lacs Band of Ojibwe and Minnesota Chippewa Tribe.

William R. Kennedy, Hennepin County Public Defender, Peter W. Gorman, Asst. Public Defender, Minneapolis, for amici curiae, Hennepin County Public Defender.

Katie Trotzky, Amy Jane Goetz, Legal Aid Soc. of Minnesota, Minneapolis, for amici curiae, Upper Midwest American Indian Center.

Mark D. Fiddler, Indian Child Welfare Law Center, Minneapolis, for amici curiae, Minneapolis American Indian Center and Minnesota Indian Women's Resource Center.

Steven Hirsh, Leah J. Carpenter, Anishinabe Legal Services, Cass Lake, for amici curiae, Melvin E. and Audrey J. Goodman.

## OPINION

KEITH, Chief Justice.

This appeal arises out of a petition by the respondents, non-Indian foster parents, E.C. and C.C., to adopt three Native American children for whom they had provided foster care. At issue is whether the placement preferences provision of the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1915 (1988), provides a "good cause" exception for "extraordinary emotional needs" based on a child's need for permanence in the form of adoption; also at issue is whether the record in this case supports the trial court's findings that these children had extraordinary emotional needs and that there was an "unavailability of suitable families for placement" after a diligent search. We hold, while good cause may include a child's need for stability, this is not equivalent to a need to be adopted. We also hold that, in this case, the record failed to support the trial court's findings that these children have extraordinary emotional needs. We therefore reverse.

### I

In 1978, Congress enacted the ICWA to prevent the destruction of Indian families by reducing removal of Indian children from their communities and to relieve the difficulties experienced by Indian children raised in non-Indian homes by providing preferences for placements within Indian communities. Testimony before Congress indicated there were wide-spread abuses in the placement of Indian children by courts and welfare agencies in states with Indian populations.

One important way in which the Act achieves its goals is by granting to tribal courts exclusive jurisdiction over child custody proceedings involving Indian children living within the reservation, and by providing for transfer of jurisdiction to the tribe, absent good cause to the contrary, of child custody proceedings involving Indian children living off the reservation. 25 U.S.C. § 1911(a), (b). In interpreting this provision, the United States Supreme Court noted, "It is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its enactment, that Congress was concerned with the rights of Indian families and Indian communities vis-á-vis state authorities." *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S.. 30, 44–45, 109 S.Ct. 1597, 1606, 104 L.Ed.2d 29 (1989). The Court concluded, "Indeed, the congressional findings that are a part of the statute demonstrate that Congress perceived the States and their courts as partly responsible for the problem it intended to correct." *Id.* at 45, 109 S.Ct. at 1606 (citation and footnote omitted).

The substantive provisions of the Act include § 1915(a), the provision at issue in this case, which sets forth the adoptive placement preferences.[1] Other requirements include: the tribes' right to intervene in and be notified of custody proceedings involving Native American children, 25 U.S.C. §§ 1911(c) and 1912(a); higher standards of proof to remove Native American children and to terminate Native Americans' parental rights, § 1912(e), (f); a requirement that Native American children be returned to their parent upon the parent's revocation of consent to placement or to voluntary relinquishment of parental rights, § 1913(b), (c); and a provision that Native American parents or tribes may petition to vacate any action involving custody of a Native American child upon a showing that the action violated the Act, § 1914.

As the Supreme Court has stated:

The ICWA thus, in the words of the House Report accompanying it, "seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society." It does so by establishing "a Federal policy that, where possible, an Indian child should remain in the Indian community," and by making sure that Indian child welfare determinations are not based on "a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family."

*Mississippi Band of Choctaw Indians,* 490 U.S. at 37, 109 S.Ct. at 1602 (citations and footnote omitted).

## II

The parents of the children whose placement is at issue in this case are a Chippewa woman and a white man. S.E.G., the oldest child, was born in 1984; A.L.W. was born in 1985 and V.M.G. in 1987. The factors leading to the family's involvement with the child welfare system are not entirely clear from the record. A.L.W. was first placed out of the home for "failure to thrive" in January, 1986. She was moved to a relative's home in September of 1986 and returned to her mother in December, 1986. The family was apparently still being supervised by Cass County when they moved out of Minnesota in violation of a court order. When the family returned to Minnesota, the children lived at the home of their maternal grandmother.

After V.M.G. was born, the mother was unable to care for them and voluntarily placed all three children in foster care. The children have not lived with their parents since February, 1988. A.L.W. and V.M.G. were moved six times—and S.E.G. five—in the next three years, before being placed in E.C. and C.C.'s therapeutic (PATH) foster home in August, 1991. E.C. and C.C. are a non-Indian couple.

The children remained in E.C. and C.C.'s home until January 29, 1992 when they were placed in a Native American pre-adoptive home. Though discussed in advance, the children's move was not well planned and

---

1. *Placement of Indian children. (a) Adoptive placements; preferences.* In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families. 25 U.S.C. § 1915.

occurred without prior overnight visits. The placement lasted only nine days, after which the children were returned to E.C. and C.C.'s foster home.

On October 8, 1992, the children were placed in a Native American PATH home in Minneapolis. They moved from that placement within two months because the foster mother was "emotionally not ready to handle the children." The children were then placed in A.C.'s Native American PATH home in Cloquet, Minnesota, where they have resided since November 13, 1992.

When the children were being placed through PATH, S.E.G. and A.L.W. were identified as having "special needs" and were evaluated by therapists. V.M.G. was evaluated and did not turn out to have any particular special needs, though her therapist recommended that she be placed in a "secure, consistent environment for the long-term."

S.E.G.'s special needs consisted primarily of a language disorder and behavioral problems. In the therapist's opinion, S.E.G. had not bonded with E.C. and C.C. when she was removed, but she was in the process of bonding with them. The therapist believed S.E.G. could achieve a sense of belonging or permanence with an attachment to her tribe "if that's an ongoing part of her life." Finally, the therapist stated that she believed S.E.G. needed to be in a permanent placement and "the sooner the better." In school, S.E.G. was in regular classrooms but required some special education services in speech, cognitive, and social skills.

A.L.W.'s special needs were the most extensive. She exhibited inappropriate sexual acting out behavior, "low intellectual functioning," and speech difficulties. A.L.W.'s school identified her as having a handicapping condition and as being in need of special education services. A.L.W.'s therapist noted she had "some inappropriate ways of expressing anger" and that she had "barrier and boundary issues, interpersonal distancing." One of A.L.W.'s foster mothers filled out forms regarding her skills and development, and from these the therapist determined that A.L.W. was "far below age-level." The therapist recommended "that [A.L.W.] be continued in her EBD [emotional behavior

disorders] placement along with seeking some individual counseling with a therapist who specializes in children's emotional problems. Additionally, placement in a home environment that emphasizes consistency and nurturance along with the knowledge of the dynamics of sexual abuse victimization would be extremely helpful."

Expert and lay witnesses from both sides testified that the children had a strong need for stability in their home environment. All of the witnesses for the Leech Lake Band of Chippewa were recognized as "qualified expert witnesses" by the trial court. E.C. and C.C. presented two witnesses whom the trial court recognized as "qualified Indian experts." All the testimony seemed to show that E.C. and C.C.'s foster home and A.C.'s Native American foster home each provided for the children's physical, emotional, and intellectual needs, but the witnesses disagreed about whether E.C. and C.C. provided for—or could provide for—the children's cultural needs and whether A.C. provided for the children's need for permanence.

Several of the experts identified as "qualified Indian experts" by the trial court testified that Native American children who grow up in non-Native homes suffer from intense identity crises in adolescence. E.C. and C.C.'s friend from church—a white woman married to a Native American man—was qualified as an expert. She testified that she did not observe that traditional Indian parenting techniques were common on the Red Lake Reservation and that she believed the children were bonded and attached to E.C. and C.C. Darrell Auginash, a Native American man who lives and works as a counselor on the Red Lake Reservation, was also qualified as an expert. He testified that he would be willing to work with E.C. and C.C. to educate the children about their culture if E.C. and C.C. were allowed to adopt. He also testified:

I think as far as identity is concerned, I think that usually comes a little later. The most important thing that most children are concerned about is their, is their security, their, their home, their structure and the love that's provided for them by their family and people like that. And the ones

that experience the most dysfunction, have a high percentage rates of some of the problems like suicide and alcoholism and drug abuse, delinquency.

When asked whether, in his opinion, cultural identity could be taught to and understood by a child who did not live in a Native American home or on a reservation, he testified: "I believe that as far as this heritage and this culture is concerned, I think that you can learn it just as well in an urban setting or off the reservation * * *. You learn it where you're at with whomever. And I can take it anywhere and teach it."

E.C. testified that he was unable to describe the difference between the Leech Lake Band of Chippewa and the Minnesota Chippewa Tribe and could not identify the clan of which the children were members. He testified that he tried to learn as much as possible about Native American culture through his friendships with Native Americans and by reading Native American publications. E.C. and C.C. clearly made efforts to expose the children to Native American cultural events; they attended two powwows, a few storytellings and arranged a naming ceremony for S.E.G. at the suggestion of a social worker.

All of the social workers and therapists involved with the family in the A.C. foster home noted that the children had "identity issues" related to their Native American heritage and that these issues showed improvement in A.C.'s care. S.E.G.'s therapist—when S.E.G. was in E.C.'s and C.C.'s home—testified that S.E.G. seemed to be confused about the fact that E.C. and C.C. could not keep her because she was Native American and they were white. She noted that S.E.G. hoped E.C. and C.C. would "fight for her."

Finally, all three Native American social workers—each of whom was qualified as an Indian expert by the trial court—stated that the most important thing for the children at that time was that they "stabilize" in the

current home. Fred Isham, a foster care adoption worker with the Minnesota Chippewa Tribe Human Services Division, testified that he was "actively recruiting an adoptive home for the [children]," but that they were not ready for adoption at that time. It seemed clear from the testimony that the workers not only expected the children to remain in A.C.'s home for an unspecified period of time until they "stabilized" but also expected they eventually would be moved to an adoptive home.

Based upon all of the above evidence and the guardian ad litem's recommendation,[2] the trial court held that good cause existed to place the children in a manner inconsistent with § 1915(a). The court held that the children had "extraordinary physical and emotional needs" and that those needs had been established by the testimony of "several qualified experts." The court also held that a suitable family for adoption was unavailable after a diligent search had been completed. The trial court ordered that E.C. and C.C.'s petition for adoption be allowed on May 20, 1993. The court of appeals affirmed on November 16, 1993. *In Re S.E.G., A.L.W. and V.M.G.*, 507 N.W.2d 872 (Minn.App.1993).

### III

The issue presented by this case is whether there is good cause not to follow the preference provisions of § 1915(a). Nothing in the ICWA or its legislative history suggests a definition of good cause or describes the factors to be considered in determining whether it exists.[3]

The BIA guidelines, however, offer some structure to state courts interpreting this provision. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584–67,595 (1979). Section F.3 of the guidelines describes circumstances which create "good cause" to modify the placement preferences of the Act:

---

2. The guardian ad litem was a junior at Bemidji State University working on a social work degree. She attended guardian ad litem training and had acted as a guardian in roughly 10–12 cases. She is also Native American. Neither party moved to have her qualified as an expert witness.

3. Subsection (c) notes: "Where appropriate, the preference of the Indian child or parent shall be considered * * *." 25 U.S.C. § 1915(c). This suggests that the parents' or child's preferences may constitute good cause.

F.3. Good Cause To Modify Preferences

(a) For purposes of foster care, pre-adoptive or adoptive placement, a determination of good cause not to follow the order of preference set out above shall be based on one or more of the following considerations:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

(b) The burden of establishing the existence of good cause not to follow the order of preferences established in subsection (b) shall be on the party urging that the preferences not be followed.

*Id.* at 67,594. The guidelines also state, however, that Congress intended to give state courts some discretion in these cases:

Primary responsibility for interpreting other language used in the Act, however, rests with the courts that decide Indian child custody cases. *For example, the legislative history of the Act states explicitly that the use of the term "good cause" was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child.*[4]

*Id.* at 67,584 (emphasis added).

■ The Supremacy Clause, as well as state law, requires that placement decisions in Minnesota courts meet the "minimum" requirements of ICWA. *See* U.S. Const. art. VI; 25 U.S.C. § 1902; Minn.Stat. § 256F.07, subd. 2 (1992). Since long before the passage of the ICWA, child custody cases have been decided pursuant to the "best interests of the child" standard. *E.g., State ex rel.*

*Jaroszewski v. Prestidge,* 249 Minn. 80, 81 N.W.2d 705 (1957). ICWA appears to create a presumption that placement of Indian children within the preferences of the Act is in the best interests of Indian children.[5]

At least two courts which have interpreted the "good cause" exception of § 1915 have determined that courts may consider the best interests of the child in determining whether the exception applies. In *Matter of Adoption of F.H.,* 851 P.2d 1361 (Alaska 1993), the Supreme Court of Alaska stated: "Whether there is good cause to deviate in a particular case depends on many factors including, but not necessarily limited to, the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement and the child's ties to the tribe." *Id.* at 1363–64. Similarly, in *Adoption of M.,* 66 Wash.App. 475, 832 P.2d 518 (Ct.1992), the Court of Appeals of Washington noted:

Good cause is a matter of discretion, and discretion must be exercised in light of many factors. These include but are not necessarily limited to the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement, the child's ties to the tribe, and the child's ability to make any cultural adjustments necessitated by a particular placement.

*Id.* 832 P.2d at 522 (citations omitted).

■ We believe, however, that a finding of good cause cannot be based simply on a determination that placement outside the preferences would be in the child's best interests. The plain language of the Act read as a whole and its legislative history clearly indicate that state courts are a part of the problem the ICWA was intended to remedy. *See Mississippi Band of Choctaw Indians,* 490 U.S. at 44–45, 109 S.Ct. at 1606–07. Furthermore, the report from our own Task Force on Racial Bias in the Judicial System

---

**4.** This section of the guidelines cites to S.Rep. No. 597, 95th Cong., 1st Sess. 17 (1977). The Senate Report is actually referring to the phrase "good cause" in a section of the bill equivalent to § 1911. *Id.* at 5, 17. The BIA's statement seems reasonably applied to both sections of the Act, however.

**5.** Section 1902 of the ICWA says simply, "The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children * * *." 25 U.S.C. § 1902.

indicates that insensitivity to minority cultures remains a problem in child welfare cases. *See Minnesota Supreme Court Task Force on Racial Bias in the Judicial System, Final Report,* 16 Hamline L.Rev. 477, 624–646 (1993).[6] The best interests of the child standard, by its very nature, requires a subjective evaluation of a multitude of factors, many, if not all of which are imbued with the values of majority culture. It therefore seems "most improbable" that Congress intended to allow state courts to find good cause whenever they determined that a placement outside the preferences of § 1915 was in the Indian child's best interests. *Cf. Mississippi Band of Choctaw Indians,* 490 U.S. at 45, 109 S.Ct. at 1606–07.

Though the BIA guidelines are not binding on the courts, the use of the word "shall" in § F.3(a) strongly suggests that a consideration of whether good cause exists should be limited to the factors described in the guidelines. 44 Fed.Reg. 67,584, 67,594 (1979). We hold, therefore, that a determination that good cause exists to avoid the placement preferences of § 1915 should be based upon a finding of one or more of the factors described in the guidelines.

The trial court found that the children's "need for permanence" was an extraordinary emotional need and that no suitable family was available for placement after a diligent search had been completed. Because these two factors are mentioned in the guidelines, we must carefully review the trial court's findings to determine whether they were adequately supported by the record.

■ Cases from other states hold that an "abuse of discretion" or "clearly erroneous" standard applies to trial court's findings of "good cause." *Matter of Adoption of F.H.,* 851 P.2d 1361, 1363 (Alaska 1993); *Adoption of M.,* 66 Wash.App. 475, 832 P.2d 518, 522 (Ct.1992). We agree with the Alaska Supreme Court's approach in *Matter of Adoption of F.H.:*

We will reverse an adoptive placement preference determination only if convinced that the record as a whole reveals an abuse of discretion or if controlling factual findings are clearly erroneous. Abuse of discretion is established if the superior court considered improper factors or improperly weighted certain factors in making its determination.

851 P.2d at 1363. We will not reverse findings of fact unless clearly erroneous. "Considering improper factors" or "improperly weighing certain factors" are issues of law, however, which we will review de novo.

In light of the Act, its legislative history, the BIA guidelines and their commentary, it does not seem that a need for permanence or stability *cannot* be considered in determining whether good cause exists in a particular case. The Supreme Court of Alaska, in *Matter of Adoption of F.H.,* 851 P.2d 1361, 1365 (Alaska 1993) seemed to assume that adoption was the only possible permanent placement available to the child. *Id.* at 1365. The Alaska Supreme Court noted that "F.H.'s *situation would be uncertain*" if the white foster parents were not allowed to adopt. *Id.* at 1365. In that case, however, F.H.'s natural mother had voluntarily relinquished her parental rights conditioned on the foster parents' adoption. *Id.* The court noted that the natural mother and foster parents had agreed to an open adoption, the natural mother testified that she could more easily visit F.H. in the foster parent's home than in the Native village in which her relatives lived, and the foster mother and F.H. had formed a strong bond. *Id.* This case presents a somewhat different problem, however, in that parental rights have already been terminated and the children would not be subjected to continued attempts at reunification with the biological parents if they were not placed in E.C. and C.C.'s home.

The Commissioner of Human Services argues that the phrase, "unavailability of suitable families for placement" does not refer

**6.** This report shows that despite the enactment of statutory schemes to prevent placement of minority children outside their communities, these children are still "vastly over-represented within the foster care system." *Id.* at 628. "For Native American children in particular, their over-representation in out-of-home placements exceeded white children by over 10 times." *Id.* at 629 (citing Minnesota Department of Human Services, *Minnesota Minority Foster and Adoptive Care, 1989,* 6 (Jan.1991)).

only to *adoptive* placement. She argues that adoption is not the only permanent placement option, and preferring adoption over other options, such as permanent foster care, may result in more placements outside Native American communities.

ICWA's § 1915(d) requires that "[t]he standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties." The record of the 1974 United States Senate Hearings supports the Leech Lake Band of Chippewa's claim that permanency is defined differently in Native American cultures. At least one witness before the trial court testified that she believed S.E.G.'s need for permanence could be met through an attachment to her tribe "if that's an ongoing part of her life." The House Report published with the passage of ICWA in 1978 notes: "For example, the dynamics of Indian extended families are largely misunderstood. An Indian child may have scores of, perhaps more than a hundred, relatives who are counted as close, responsible members of the family." H.R.Rep. No. 1386, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7532. Finally, as the report of the Task Force on Racial Bias noted regarding application of ICWA in Minnesota: "Problems can arise when a system that is largely white, with middle-class values, is called upon to evaluate cultural and racial norms which are neither white nor necessarily middle-class." *Minnesota Supreme Court Task Force on Racial Bias in the Judicial System, Final Report,* 16 Hamline L.Rev. 477, 631 (1993). Given that a need for permanence is not discussed in the Act or its regulations, it is important that this need not be defined so narrowly as to threaten or substantially reduce placements

in Native American homes. *See* 44 Fed.Reg. 67,586 (1979).

■ Here the trial court found that the children had extraordinary emotional needs but went on to find the present emotional, cultural, educational, and physical needs of the children are currently being met in the home of A.C., except for the need for permanence. In effect, the trial court found that the need for permanence alone was an extraordinary emotional need and that a suitable family for placement must be a family that could meet this need. Implicit in the trial court's findings that the children's need for permanence was not being met at A.C.'s foster home and that A.C.'s home was not a suitable family for placement was an assumption that only adoption could meet a need for permanence. We believe this holding was based on the improper assumption that the need for permanence could only be met  through adoption and, therefore, we reverse this holding as a matter of law.

The trial court also found that the children did have extraordinary emotional needs, but found that all of those needs, but the need for permanence, had been met in A.C.'s foster home.

The BIA guidelines require that a finding of extraordinary physical or emotional needs be "established by testimony of a qualified expert witness." [7] Section D.4 of the BIA guidelines addresses the use of the phrase "qualified expert witness" in the Act. Subsection (b) of this section states:

> (b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:
>
> (i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they

---

7. The commentary to the section of the guidelines discussing "extraordinary emotional needs" states: "In a few cases a child may need highly specialized treatment services that are unavailable in the community where the families who meet the preference criteria live. Paragraph (ii) recommends that such considerations be considered as good cause to the contrary." 44 Fed.

Reg. 67,585, 67,594 (1979). This commentary suggests a narrower spectrum of "extraordinary physical or emotional need" than the guidelines. Our decision regarding qualified expert witnesses makes it unnecessary to decide to what degree the commentary may narrow the definition of extraordinary emotional need.

pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her specialty.

44 Fed.Reg. 67,584, 67,593 (1979). The comments to this section of the guidelines state, "The second subsection makes clear that knowledge of tribal culture and childrearing practices will frequently be very valuable to the court." *Id.* In Minnesota, it is important to read this section of the guidelines in conjunction with § A.(2), which states:

(2) In any child custody proceeding where applicable state or other federal law provides a higher standard of protection to the rights of the parent or Indian custodian than the protection accorded under the Indian Child Welfare Act, the state court shall apply the state or other federal law, provided that application of that law does not infringe any right accorded by the Indian Child Welfare Act to an Indian tribe or child.

*Id.* at 67,586. The Minnesota Department of Human Services Social Services Manual defines a qualified expert witness somewhat more narrowly, *requiring expertise about Indian childrearing practices in all three categories. See* Minnesota Department of Human Services, *Minnesota Social Services Manual,* XIII–3586 (1987); *Matter of Welfare of B.W.,* 454 N.W.2d 437, 442 (Minn.App. 1990). "The DHS manual *adds* to paragraph (iii) the requirement that the professional have 'substantial knowledge of prevailing social and cultural standards and child-rearing practices within the Indian community.'" *Matter of Welfare of B.W.,* 454 N.W.2d at 442.

██ Most of the testimony in this case which tended to establish that the children had extraordinary physical or emotional

needs was *not* presented by qualified expert witnesses. E.C. and C.C. presented only two witnesses whom they attempted to qualify as expert witnesses. By contrast, nearly all of the tribe's expert witnesses qualified under the guidelines and were found to so qualify by the trial court.

The record before the trial court supported its finding that both families adequately met the children's emotional, educational, and physical needs. By all accounts, the children generally had fared very well in E.C. and C.C.'s home, and neither party disputed that they currently were doing well in A.C.'s home. However, the *qualified expert witness* portion of the record seemed to show that the placement in A.C.'s home met the children's cultural needs and that it was unlikely E.C. and C.C. would have been able to meet those needs as well as A.C., though E.C. and C.C. certainly showed they would make efforts to do so. Only one qualified expert witness, Darrell Auginash, testified that he believed it was "possible" for the children's cultural needs to be met growing up in a non-Native home.[8] Mr. Auginash did not express an opinion as to whether the children had extraordinary emotional needs and he could not have so testified because he had known E.C. and C.C. only a few days at the time of trial.

Of the experts qualified by the trial court, none testified that the children had extraordinary emotional needs which were not being met in their current placement. Rather, these witnesses' testimony tended to show that the children were not ready to be adopted and needed to stabilize before being placed in an adoptive home and that their need for stability was being met in A.C.'s home. Under these circumstances, we believe that the trial court's finding of extraordinary emotional need could not have been based on the testimony of qualified expert witnesses and was therefore clearly erroneous.

Our decision today is not meant in any way as a criticism of the trial court's handling of

---

8. The second of E.C. and C.C.'s qualified experts was a white woman married to a Native American man who testified that she did not think the

"traditional child-rearing practices" were widely used in the Native American community.

the matter. By contrast, it was because of that court's careful decisions at trial, which lasted six days, and the court's thorough findings of fact and thoughtful memorandum that we were able to review this case effectively.

Decisions on the custody of children, even when the cultural values of all the participants are similar, are often the most difficult for our trial and appellate judges. These decisions can be even more difficult when children are born into an Indian community which may view the family and tribal community very differently from our majority culture. Congress, in conjunction with numerous Indian tribal governments and the Bureau of Indian Affairs, has carefully and thoughtfully set out the nation's policy to prevent the destruction of Indian families and Indian tribes and to protect the best interests of Indian children by preventing their removal from their communities.

For the reasons set out above, we do not believe the record in this case shows good cause to deviate from the placement preferences of the Indian Child Welfare Act.

Reversed.

ANDERSON, J., took no part in the consideration or decision of this case.