**In the Matter of the WELFARE OF the CHILD OF: T.T.B. and G.W., Parents.**

**Nos. A05–1615, A05–1631.**

Supreme Court of Minnesota.

Oct. 19, 2006.

Rehearing Denied Dec. 13, 2006.

Amy J. Klobuchar, Hennepin County Atty., Mary M. Lynch, Asst. Atty., Minneapolis, for appellant Hennepin Cty. H.S.P.H.D.

Thomas James Vollbrecht, Guy-Uriel E. Charles, Faegre & Benson, L.L.P., Minneapolis, for respondent Yankton Sioux Tribe.

Jacqueline Marie Beaulieu, Catherine LaRoque, Minneapolis, for respondent T.T.B.

Jonathan G. Steinberg, Chrastil and Steinberg, P.L.L.P., Minneapolis, for appellant and respondent Guardian Ad Litem.

Leonardo Castro, Chief, Fourth Judicial Public Defender, Peter W. Gorman, Asst. Public Defender, Minneapolis, for respondent G.W.

Janine LePage, Asst. County Atty, Brainerd, for amicus curiae Minnesota County Atty's Ass'n.

Mark D. Fiddler, Fiddler Law Office, Minneapolis, for amicus curiae Nat. Ass'n of Counsel for Children.

Mark C. Tilden, Native American Rights Fund, Boulder, CO, for amicus curiae Nat. Indian Child Welfare Ass'n.

Joseph F. Halloran, Jacobson, Buffalo, Schoessler & Magnuson, Ltd., St. Paul, for amici curiae Bois Forte Band of Chippewa, Grand Portage Band of Chippewa, White Earth Band of Chippewa, Upper Sioux Indian Community and Prairie Island Indian Community.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

This appeal arises from a juvenile protection matter concerning custody of an Indian child. Under both the Indian Child Welfare Act, 25 U.S.C. §§ 1901–1963 (2000) (ICWA), and the Minnesota Indian Family Preservation Act, Minn.Stat. §§ 260.751–.835 (2004), proceedings involving custody of an Indian child who does not reside on and is not domiciled on the reservation must be transferred to the jurisdiction of the tribe upon proper request and "in the absence of good cause to the contrary." 25 U.S.C. § 1911(b) (2000); Minn.Stat. § 260.771, subd. 3 (2004). The district court in this case concluded there was good cause under ICWA and Minnesota law to deny the transfer of jurisdiction to the tribal court. On appeal, the court of appeals reversed and remanded the matter with instructions to transfer jurisdiction. We reverse and reinstate the district court order.

In April 2003, Hennepin County filed a petition to terminate parental rights or transfer permanent legal and physical custody of A.G., an infant, from respondent mother, T.T.B., and father, M.G. T.T.B. did not appear at the scheduled November 10, 2003, pretrial hearing on this petition and was found in default. On November 15, 2003, T.T.B. gave birth to a son, X.T.B., in Rhode Island. In October 2003, prior to the child's birth, T.T.B. and respondent G.W., who is described in the proceedings below as the father of X.T.B., had traveled from Minnesota to the Rhode Island home of A.G.M.[1] Upon learning of the open custody proceeding involving A.G. in Minnesota, Rhode Island took X.T.B. into protective custody on November 19, 2003.

On November 21, 2003, Hennepin County filed an amended petition in A.G.'s case, adding X.T.B. to the petition. The amended petition sought to terminate T.T.B.'s

---

1. A.G.M. is described in the record as T.T.B.'s former foster care provider, although it appears A.G.M. never had formal physical custody of T.T.B.

parental rights to X.T.B., or to transfer permanent legal and physical custody of X.T.B. The same day, the county moved ex parte to have X.T.B. placed in protective care. The district court, acting under Minn.Stat. § 260C.175, subd. 1 (2004), ordered X.T.B. taken into custody under Minn.Stat. § 260C.151, subd. 6 (2004), and under Minn. R. Juv. Prot. P. 28.02.[2] X.T.B. was returned to Minnesota from Rhode Island on or about December 22, 2003, and was placed with his half-sister, A.G., in the home of S.G., A.G.'s paternal grandmother.[3]

At the emergency protective care hearing on December 23, 2003, the district court found the county had made the prima facie showing required under Minn. R. Juv. Prot. P. 30.08, to continue protective care of X.T.B., and the court transferred interim legal custody of X.T.B. to the county. On December 31, 2003, the county filed a separate petition seeking to terminate parental rights or transfer permanent legal and physical custody of X.T.B., and X.T.B. was dismissed from the case involving his half-sister, A.G. T.T.B. was served with the county's petition to terminate parental rights or to transfer permanent legal and physical custody of X.T.B. on January 9, 2004.

T.T.B. is a member of the Oglala Sioux Tribe, G.W. is a member of the Yankton Sioux Tribe, and X.T.B. was declared by both tribes to be eligible for membership. Both tribes received notice of the proceedings by registered mail on January 16, 2004. In addition, a representative of the county conferred with each of the tribes before placing X.T.B. in the home of S.G.

On February 17, 2004, T.T.B. and G.W. appeared in court for an admit/deny hearing, although the record does not reflect when, or if, G.W. was formally served with the petition to terminate parental rights or transfer permanent custody. At that hearing, a denial was entered on T.T.B.'s behalf, but because G.W. had only recently been appointed counsel, an admit/deny hearing on his behalf was continued to April 20, 2004.

At the continued admit/deny hearing on April 20, 2004, T.T.B.'s counsel told the court that mother favored transfer of custody to A.G.M. in Rhode Island. Counsel for G.W. indicated that G.W.'s mother, B.W., was "interested in being a foster care provider, slash, possible permanency placement" for X.T.B. Again no formal denial was entered on behalf of G.W., but the district court set a pretrial hearing for June 10, 2004, and a trial date of July 22,

**2.** Minnesota Statutes § 260C.151, subd. 6 (2004), allows the court to order a child to be taken into immediate custody upon findings "that there are reasonable grounds to believe the child is in surroundings or conditions which endanger the child's health, safety, or welfare that require that the child's custody be immediately assumed by the court and that continuation of the child in the custody of the parent or guardian is contrary to the child's welfare." The district court's order refers to "Minn. R. Juv. P. 65.02," which was renumbered as Minn. R. Juv. Prot. P. 28.02 effective January 1, 2004. Like section 260C.151, Rule 28.02, subd. 1, allows the district court to issue an ex parte order for emergency protective care upon findings that "there is a prima facie showing that the child is in surround-

ings or conditions that endanger the child's health, safety, or welfare and that require that the child's custody and care be immediately assumed by the court; and continuation of the child in the custody of the parent or legal custodian is contrary to the child's welfare."

**3.** The record does not explain the delay in returning X.T.B. to the state from Rhode Island. The record indicates there were proceedings in the Rhode Island courts involving X.T.B., but the nature of those proceedings is not part of the record before us. T.T.B. and the father of A.G. later stipulated to voluntary termination of their parental rights to A.G., who remains with her paternal grandmother, S.G.

2004, for the termination of parental rights and permanent placement. On April 30, 2004, the Yankton Sioux Tribe moved to intervene and participate in the proceedings, indicating by affidavit filed on May 26, 2004, that it was in the best interests of X.T.B. to be granted permanency "in a home approved by" the tribe.

A family group conference addressing the permanent placement of X.T.B. was held on June 4, 2004, but after considerable discussion, the participants could not reach a consensus. T.T.B. and G.W. favored transfer of custody of X.T.B. to A.G.M. in Rhode Island or, alternatively, transfer of custody to G.W. In addition, S.G., the paternal grandmother of X.T.B.'s half-sister, A.G., sought to adopt X.T.B.[4]

Following the family group conference, the district court set deadlines of July 8, 2004, for the exchange of witness and exhibit lists; July 15, 2004, for filing pretrial motions; and July 22, 2004, for the permanency trial. When the schedule proved problematic for G.W.'s counsel, the district court extended the deadline for filing witness and exhibit lists and pretrial motions to July 22, 2004, and postponed the trial to a date to be agreed upon. The court indicated the delay would likely be a matter of "several weeks."

On July 16, 2004, the county filed an amended petition for the termination of parental rights or transfer of custody that added G.W.'s address and tribal affiliation, added procedural history since the filing of the initial petition in December 2003, and added further grounds for termination of parental rights with respect to both T.T.B. and G.W. On July 21, 2004, G.W. moved for dismissal, claiming the court lacked jurisdiction and disputing grounds for termination of his parental rights. At the same time, G.W. moved to transfer custody of X.T.B. to A.G.M. in Rhode Island. In support of his motion, G.W. filed an affidavit from the Yankton Sioux Tribe's ICWA director, advocating transfer of custody to A.G.M.

The next day, July 22, 2004, T.T.B. and G.W. moved to transfer jurisdiction of the proceedings to the Yankton Sioux Tribal Court. Later the same day, the district court issued orders setting a hearing on the various pretrial motions for August 12, 2004, an evidentiary hearing on October 5, 2004, and a permanency trial date of October 27, 2004. During the August 12, 2004 hearing, the court denied G.W.'s motion to dismiss, but deferred its ruling on the motion to transfer jurisdiction to allow the Yankton Sioux tribe additional time to file a written acceptance of jurisdiction. Also during the August 12 hearing, the county indicated it would no longer seek termination of parental rights and instead would pursue only permanent placement of X.T.B.

In connection with the potential placement of X.T.B. with A.G.M., Rhode Island conducted a home study under the Interstate Compact on the Placement of Children. The Interstate Compact obligates the receiving state to determine whether placement is suitable, and bars physical transfer of the child until authorities in the receiving state notify the sending agency that the proposed placement does not appear to be contrary to the interests of the child. Minn.Stat. § 260.851 (2004). By written report dated August 5, 2004, Rhode Island recommended against placement of X.T.B. with A.G.M. in Rhode Island. Rhode Island's decision effectively

4. The Yankton Sioux Tribe ICWA director and the Urban Tribe representative participated in the family group conference. Although the Oglala Sioux Tribe had moved to intervene in the proceedings in February 2004 and its ICWA representative had been invited to the conference, the tribe did not attend.

barred the district court from transferring custody of X.T.B. to A.G.M. for either temporary placement purposes or adoption.[5] *See id.*

On September 24, 2004, the Yankton Sioux Tribe moved to transfer jurisdiction to its tribal court. The motions to transfer jurisdiction came on for hearing on October 5, 2004. The district court notified the parties by telephone on October 15, 2004, that the motions to transfer jurisdiction were denied. The written order, dated October 27, 2004, cited as grounds for denying transfer that the requests came at an advanced stage of the proceedings. The matter proceeded to trial on stipulated facts; and by order filed on February 17, 2005, legal and physical custody of X.T.B. was transferred to S.G., with whom he had resided since December 23, 2003. The order provided for reasonable visitation/parenting time and recognized that S.G. agreed to ongoing contact with the tribe. Post-trial motions for new trial were denied.

On the appeal of G.W. and the Yankton Sioux Tribe, the court of appeals concluded that good cause did not exist to deny transfer of jurisdiction to the tribal court. The court of appeals therefore reversed and remanded the matter to the district court for transfer of jurisdiction to the Yankton Sioux Tribal Court. We granted expedited review.[6]

## I.

Review of the motions to transfer jurisdiction made by T.T.B., G.W., and the Yankton Sioux Tribe requires consideration of two federal acts, several Minnesota statutes, and our own rules of juvenile protection procedure. Consequently, it may be helpful to set out briefly the statutes and rules.

## A.

■ Under the Supremacy Clause, U.S. Const. art. VI, the decision whether to transfer jurisdiction of child custody proceedings to a tribal court must meet the minimum requirements of the Indian Child Welfare Act. Congress enacted ICWA to address the "rising concern in the mid–1970s over the consequences * * * of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). The aim of the Act is to protect the interests of Indian children and to promote the stability and security

---

5. G.W.'s counsel indicated to the district court on August 12, 2004, that she had oral notice of the report's conclusions "within the last month."

6. G.W. and the tribe also appealed from the district court's determination that it had personal jurisdiction over X.T.B., and that it had subject matter jurisdiction. The court of appeals denied the appeal on these issues and neither G.W. nor the tribe petitioned for their conditional review by our court. As a result, those issues are not before us. The court of appeals also found the district court had abused its discretion in denying transfer to the tribal court on grounds of forum non conveniens. Appellants did not seek further review of this issue and, as a result, it also is not before us. Finally, G.W. appealed from the district court's transfer of legal and physical custody to S.G. and its denial of A.G.M.'s motion to intervene. Because the court of appeals held that the district court had abused its discretion in denying the motion to transfer jurisdiction, the court of appeals did not reach these issues. Neither G.W. nor the tribe sought conditional review of the district court's transfer of legal and physical custody to S.G., or its denial of A.G.M.'s motion to intervene, and therefore those issues also are not before us here.

of Indian communities and tribes. 25 U.S.C. § 1902 (2000).

ICWA establishes minimum standards for, among other things, the placement of Indian children "in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902. To that end, ICWA grants the tribal court exclusive jurisdiction over child custody proceedings involving an Indian child who resides or is domiciled on the reservation, or who is a ward of the tribe. 25 U.S.C. § 1911(a) (2000). Minnesota law similarly provides exclusive jurisdiction in the tribal court when the child resides on the reservation. Minn.Stat. § 260.771, subd. 1 (2004).

In the case of an Indian child who neither resides nor is domiciled within the reservation, ICWA and Minnesota law recognize concurrent but presumptively tribal jurisdiction, allowing the child's tribe to intervene "at any point" in the state court proceedings. 25 U.S.C. § 1911(b) (2000) (jurisdiction); 25 U.S.C. § 1911(c) (2000) (intervention); Minn.Stat. § 260.771, subd. 3 (2004) (granting state courts jurisdiction over proceedings involving an Indian child who does not reside within the reservation or who is not in the legal custody of a person or agency pursuant to an order of a tribal court); Minn.Stat. § 260.761, subd. 6 (2004) (giving the Indian child's tribe the right to intervene at any point in state court proceedings). ICWA requires that proceedings involving foster care placement of a child neither residing nor domiciled within the reservation be transferred to the jurisdiction of the child's tribe upon the petition of either parent, the child's Indian custodian, or the child's tribe, "in the absence of good cause to the contrary." 25 U.S.C. § 1911(b). Minnesota law similarly requires transfer of the proceedings to the tribal court "in the absence of good

cause to the contrary." Minn.Stat. § 260.771, subd. 3.

But ICWA and Minnesota law also allow either parent to block the transfer of jurisdiction to the tribal court and allow the tribal court to decline jurisdiction. 25 U.S.C. § 1911(b); Minn.Stat. § 260.771, subd. 3. Thus, under both ICWA and Minnesota law, the state court will retain jurisdiction over foster care placement of an Indian child who neither resides nor is domiciled on the reservation if: (1) transfer of jurisdiction to the tribal court is not requested; (2) either parent objects to transfer; (3) the child's tribal court declines jurisdiction; or (4) the state court finds "good cause" to deny a request for transfer.

Neither ICWA nor Minnesota law define or provide examples of "good cause" to deny a motion to transfer jurisdiction to the tribal court. However, the Bureau of Indian Affairs (BIA) published guidelines in 1979 for use by state courts in Indian child custody proceedings. BIA Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,-584–67,595 (November 26, 1979). These guidelines are not intended to have binding legislative effect, *id.* at 67,584, but we have referred to them as offering "some structure to state courts." *Matter of Custody of S.E.G.,* 521 N.W.2d 357, 361 (Minn.1994) (stating that the BIA Guidelines offer "some structure to state courts" in deciding whether to place an Indian child in a non-Indian home). The guidelines specifically note that the use of the term "good cause" was "designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.* at 362 (quoting BIA Guidelines, 44 Fed. Reg. at 67,584).

The BIA Guidelines indicate that a request to transfer jurisdiction "shall be

made promptly after receiving notice of the proceeding." BIA Guidelines, 44 Fed. Reg. at 67,590. According to the commentary, there is good cause to deny the transfer request when a party who could have petitioned earlier "waits until the case is almost complete to ask that it be transferred to another court and retried." *Id.* In addition, the BIA Guidelines offer five criteria for determining "good cause" not to transfer the proceeding to tribal court, one of which is relevant here: "The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing." *Id.* at 67,591. The BIA Guidelines also caution, however, that socioeconomic conditions or the perceived adequacy of tribal social services or court systems may not be considered in determining the existence of good cause. *Id.*

### B.

In ascertaining whether this case was at an advanced stage of the proceedings when the motions to transfer were filed and whether the parties seeking transfer acted promptly after receiving notice, we look next to the federal Adoption and Safe Families Act of 1997 (ASFA), Pub.L. 105–89, 111 Stat. 2115 (1997) (codified primarily, but not exclusively at 42 U.S.C. § 670 et. seq. (2000)). As explained by subsequent legislation, ASFA "promotes stability and permanence for abused and neglected children by requiring timely decisionmaking in proceedings to determine whether children can safely return to their families or whether they should be moved into safe and stable adoptive homes or other permanent family arrangements outside the foster care system." Act of Oct. 17, 2000, Pub. L. 106–314, § 2(3), 114 Stat. 1266 (2000). To that end, ASFA mandates that the state make reasonable efforts to preserve and reunify families, except where a court has determined that reasonable reunification efforts are not required. 42 U.S.C. § 671(a)(15)(B), (D) (2000). ASFA requires, as a condition of receiving federal funding for foster care payments, that the state establish procedures that ensure each child in foster care "has a permanency hearing in a family or juvenile court or another court of competent jurisdiction (including a tribal court) within 12 months of entering foster care." 42 U.S.C. § 675(5)(C) (2000).

Minnesota law reflects the requirements of ASFA. Under Minn.Stat. § 260C.001, subd. 3 (2004),

> [t]he purpose of the laws relating to termination of parental rights is to ensure that:
>
> (1) when required and appropriate, reasonable efforts have been made by the social services agency to reunite the child with the child's parents in a home that is safe and permanent; and
>
> (2) if placement with the parents is not reasonably foreseeable, to secure for the child a safe and permanent placement, preferably with adoptive parents or a fit and willing relative through transfer of permanent legal and physical custody to that relative.

In addition, Minn.Stat. § 260C.201 (2004) sets outside limits for permanency determinations. Section 260C.201, subd. 11 (2004), requires a permanency hearing to determine the permanent status of a child not later than 12 months after the child is placed in foster care. For children under the age of 8 years, section 260C.201, subd. 11a(a) (2004), requires a hearing within 6 months of the child's out-of-home placement at which the court is to review the progress of the case, the parent's progress on the out-of-home placement plan, and the provision of services to parent and

child. If the court finds that the parent is not complying with the out-of-home placement plan, or is not maintaining regular contact with the child, the court may order the responsible social services agency to develop a plan for permanent placement of the child away from the parent and to file a petition in support of such permanent placement plan. *Id.*, subd. 11a(c)(2) (2004).

## C.

The statutory procedures mandated by ASFA and codified in Minnesota Statutes, chapter 260C are mirrored in our Rules of Juvenile Protection Procedure. A permanent placement determination hearing involving a child under the age of 8 years is to commence within 6 months of the child's placement away from the parent. Minn. R. Juv. Prot. P. 39.02, subd. 1(b). If the court finds that the parent is not complying with the case plan, and the permanency plan is either transfer of custody or termination of parental rights, within 30 days of the permanent placement determination hearing, the responsible social services agency must file a petition supporting the plan. *Id.* The court must hold a trial on a petition for transfer of custody within 30 days of its filing or within 90 days in the case of a petition for termination of parental rights. *Id.* Rule 39.05 requires the district court to make a finding and issue an order, within 15 days of the conclusion of the trial, regarding whether the statutory grounds set forth in the petition have or have not been proven. "The timelines for a permanent placement determination hearing are maximum." 13 Robert Scott & John O. Sonsteng, *Minnesota Practice—Juvenile Law & Practice* 429 (3d ed. Supp. 2005).

## II.

■ In reliance primarily upon the BIA Guidelines within the context of federal and state placement-determination deadlines, the district court determined that the proceedings in this case were at an advanced stage when the motions to transfer jurisdiction to the tribal court were filed, and that the parties had not acted promptly after receiving notice of the proceedings. Whether there was "good cause" to deny transfer of jurisdiction presents a mixed question of law and fact. While the parties disputed the ultimate placement of the child, the facts surrounding the timing of the motions to transfer jurisdiction to the tribal court were not disputed. The application of a statute to essentially undisputed facts is a question of law that this court reviews de novo. *Varda v. Northwest Airlines Corp.*, 692 N.W.2d 440, 444 (Minn.2005).

## A.

■ This juvenile protection matter commenced with a petition for termination of parental rights or transfer of permanent legal and physical custody of the child, filed on December 31, 2003. The county served the petition on both tribes involved in this case by registered mail on January 16, 2004. For over 7 months, the parties litigated permanent placement. A home study was conducted in Rhode Island. A family group conference was held. Witness and exhibit lists were due on July 8, 2004, pretrial motions were due on July 15, and the matter was originally scheduled for trial on the permanency petition for July 22, 2004. But due to various motions, including the joint motion to transfer jurisdiction filed on July 22, 2004, and the tribe's separate motion to transfer jurisdiction filed on September 28, 2004, as well as the complicated nature of the proceedings, the permanency trial was postponed to October 27, 2004. By the time the motions for transfer were filed, the procedural rules required the court to have already

held the 6–month permanent placement determination hearing. The record reflects that the initial motion for transfer was not made until the day on which the permanency trial was initially scheduled. Accordingly, on these facts examined in the context of all the circumstances, we conclude that these proceedings were at an advanced stage when the motions for transfer were filed.

Respondents, however, contend that the July 22, 2004 joint motion to transfer jurisdiction cannot be considered to have been filed at an advanced stage of the proceedings because it was filed less than a week after the county filed an amended petition to terminate parental rights and more than 3 months before the eventual permanency trial on October 27, 2004. The juvenile protection procedural rules not only permit, but require, the filing of amended petitions at various stages of the proceedings. For example, before a permanent placement determination hearing, the county attorney must file a written report describing the progress of the case and the case plan; this written report may take the form of a petition to transfer permanent legal and physical custody. Minn. R. Juv. Prot. P. 42.04, subd. 1(a). As a result, it seems to us that the effect of an amended petition on any given stage of the proceedings needs to be addressed on a case-by-case basis, taking into account the nature of the amendment. In this case, the amendment merely served to update undisputed procedural history and did not change the nature of the proceedings. As for the timing of the joint transfer motion in relation to the rescheduled trial, the motion was filed on the same day that witness lists, exhibit lists, and motions in limine were due, indicating that the proceedings were at an advanced stage when the transfer requests were made.

**B.**

In determining whether there was good cause to deny transfer of jurisdiction to the tribal court, the BIA Guidelines also take into consideration whether the party moving to transfer jurisdiction has acted promptly after receiving notice of the proceedings:

> Either parent, the Indian custodian or the Indian child's tribe may, orally or in writing, request the court to transfer the Indian child custody proceeding to the tribal court of the child's tribe. The request shall be made promptly after receiving notice of the proceeding. If the request is made orally it shall be reduced to writing by the court and made a part of the record.

BIA Guidelines, 44 Fed. Reg. at 67,590. The commentary notes that inclusion of a time requirement "is designed to encourage the prompt exercise of the right to petition for transfer in order to avoid unnecessary delays." *Id.* at 67,591. The commentary also notes:

> If a transfer petition must be honored at any point before judgment, a party could wait to see how the trial is going in state court and then obtain another trial if it appears the other side will win. * * * The Act was not intended to authorize such tactics and the "good cause" provision is ample authority for the court to prevent them.

*Id.* at 67,590.

As indicated, the record shows that T.T.B. and the Yankton Sioux Tribe were served with the petition to terminate parental rights or transfer permanent custody in January 2004. G.W. appeared in court on the petition in February 2004 and was appointed counsel at that time. But T.T.B. and G.W. did not move to transfer jurisdiction until July 22, 2004; and the Yankton Sioux Tribe, which had intervened and participated in some of the pro-

ceedings, indicated no interest in transferring jurisdiction until September 24, 2004.[7] Given that T.T.B., G.W., and the Yankton Sioux tribe had notice from the outset of the case that permanent placement of the child was the intended disposition, but waited 6 months and, in the case of the Yankton Sioux tribe, 8 months, to exercise their right to move for transfer of jurisdiction, we conclude that the motions for transfer of jurisdiction in this case were not made promptly after receiving notice of the proceedings.

To be sure, tribal courts are a proper forum for Indian child custody cases. "[W]e must defer to the experience, wisdom, and compassion of the * * * tribal courts to fashion an appropriate remedy" in Indian child welfare cases. *Holyfield*, 490 U.S. at 54, 109 S.Ct. 1597 (quoting *In re Adoption of Halloway*, 732 P.2d 962, 972 (Utah 1986)). And we are not unmindful that the good-cause exception for the transfer of cases to tribal courts has been a source of conflict, with some critics arguing that the exception ought to be abrogated because it too easily serves as a means to circumvent ICWA. *E.g.*, Jeanne Louise Carriere, *Representing the Native American: Culture, Jurisdiction, and the Indian Child Welfare Act*, 79 Iowa L.Rev. 585, 648 (1994) (recommending elimination of good-cause exception). Another commentator, however, found that "today most state courts and state child welfare agencies seem to be making broad-based efforts to comply with the statutory directives, although the occasional blatant flouting of the Act undoubtedly occurs." Barbara Ann Atwood, *Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance*, 51 Emory L.J. 587, 622 (2002).

Here, there is nothing in the record to suggest that resort to the good-cause exception was done for purposes of undermining ICWA. Instead, the record reflects much effort on the part of the district court and the county to comply with ICWA's directives.

In summary, we conclude that the BIA Guidelines' "good cause" criteria were met here, and the district court had good cause to deny the motions to transfer jurisdiction of the case to the tribal court. Accordingly, we reverse the court of appeals' decision and reinstate the district court's order denying transfer of jurisdiction to the tribal court.

Reversed; district court order denying transfer of jurisdiction to the tribal court reinstated.

PAGE, Justice (dissenting).

I respectfully dissent. The policy underlying the Indian Child Welfare Act (ICWA) is

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.

25 U.S.C. § 1902 (2000).

The ICWA was enacted because "an alarmingly high percentage of Indian families [had been] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and [because] an alarmingly high percentage of such children [were] placed in non-Indian foster and adoptive homes and

---

7. At oral argument, counsel for respondents stated that the tribe's motion to transfer jurisdiction was filed on September 8, 2004. The motion to transfer is dated September 8, but was not filed in the district court until September 24.

institutions." 25 U.S.C. § 1901, subd. 4 (2000). Congressional hearings and reports chronicled the scale of the abusive child-welfare practices that Native-American families were required to endure:

> Studies undertaken by the Association on American Indian Affairs in 1969 and 1974, and presented in the Senate hearings, showed that 25 to 35% of all Indian children had been separated from their families and placed in adoptive families, foster care, or institutions. Adoptive placements counted significantly in this total: in the State of Minnesota, for example, one in eight Indian children under the age of 18 was in an adoptive home, and during the year 1971–1972 nearly one in every four infants under one year of age was placed for adoption. The adoption rate of Indian children was eight times that of non-Indian children. Approximately 90% of the Indian placements were in non-Indian homes.

*Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 32–33, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (citing Indian Child Welfare Program, Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 93d Cong., 2d Sess., 3, 15 (statement of William Byler); H.R.Rep. No. 95–1386, p. 9 (1978), 2nd Sess. 1978 U.S.Code Cong. & Admin.News 7530, 7531) (citations omitted). Sadly, as the senate subcommittee hearings make clear, Minnesota's role in the abusive removal of these children was prominent.

These abusive practices have taken a heavy toll on Native-American culture, as well as Native-American children individually. *See* Curt Brown, *Finding Indian Adoptees' Pasts,* Star Trib. (Minneapolis), July 3, 2006, at B1 (quoting a First Nations Orphan Association official as referring to pre-ICWA policies as "the cultural rape of forced assimilation"); Susan Baxter Quash–Mah & Deb Johnson Shelton, *Seeking Permanent Homes for American Indian Children,* Native American Times, Nov. 24, 2004, at 4 (noting that the teen suicide rate among Native-Americans is higher than among any other ethnic or racial group and that the suicide rate is even higher for Native-American children raised in non-Native-American homes).

The court relies on authority suggesting that most state court systems and child welfare agencies seem to be making broad-based efforts to fulfill the mandates of the ICWA. *See* Barbara Ann Atwood, *Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance,* 51 Emory L.J. 587, 622 (2002). However, the court cites no examples of such efforts in Minnesota. Moreover, in the end, the relevant question is not whether states are making broad-based efforts to comply with the ICWA, but rather the question that needs to be asked is whether the states' efforts are effective. It is not clear that Minnesota's efforts have been effective. In fact, a report from this court suggests not only that Native-American children continue to be disproportionately placed out of home, but also that the number of such out-of-home placements is increasing. Minnesota Supreme Court, *Minnesota's Court Performance in Child Protection Cases: A Reassessment Under The Federal Court Improvement Program* 24 (Dec. 2005). Because the goals of the ICWA appear to be unfulfilled and because, as the court notes, the good-cause exception for the transfer of cases to tribal courts may operate as a mechanism for easy circumvention of the ICWA, I would interpret the good-cause exception narrowly and hold it to be inapplicable to the circumstances of the present case.[1]

Irrespective of whether the good-cause exception was invoked in this case for the purpose of undermining the policy underlying the ICWA, by today's decision the ICWA is undermined nonetheless, and the goals of the ICWA—yet to be achieved—are placed further out of reach by the precedent this case sets.

Therefore, I dissent.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Page.

---

1. In addition, I question the wisdom of blind allegiance to guidelines created in 1979 by the Bureau of Indian Affairs—an agency that bears much of the responsibility for the offensive child welfare practices targeted by the ICWA. *Cf.* Lisa Demer, *Natives receive apology for 1950s racial adoptions*, Anchorage Daily News, Apr. 25, 2001, B1.