**In the Matter of the WELFARE OF the Child of R.S. and L.S., Parents.**

**No. A10–1390.**

Supreme Court of Minnesota.

Oct. 26, 2011.

---

**46**

Mark D. Fiddler, Fiddler Law Office, P.A., Minneapolis, MN, for appellant guardian ad litem.

Brett A. Corson, Fillmore County Attorney, Lee Novotny, Assistant Fillmore

County Attorney, Preston, MN, for respondent Fillmore County.

Marc A. Al, Stoel Rives LLP, Minneapolis, MN; and Rebecca J. McConkey, White Earth Band of Ojibwe, White Earth, MN; and Heidi A. Drobnick, Swanson, Drobnick & Tousey, P.C., Woodbury, MN, for respondent White Earth Band of Ojibwe.

Lori Swanson, Attorney General, Cynthia B. Jahnke, Assistant Attorney General, St. Paul, MN, for amicus curiae Commissioner of the Minnesota Department of Human Services.

Bruce Jones, Jennifer Dukart, Faegre & Benson, LLP, Minneapolis, MN; and Shannon Smith, Minneapolis, MN, for amicus curiae ICWA Law Center.

Matthew L.M. Fletcher, Kathryn E. Fort, East Lansing, Michigan, Heidi Bogda, Cass Lake, MN, Barbara Cole, Onamia, MN, for amici curiae Indigenous Law and Policy Center, Leech Lake Band of Ojibwe, and Mille Lacs Band of Ojibwe.

Kurt V. BlueDog, Jessica L.K. Ryan, BlueDog, Paulson & Small, P.L.L.P., Minneapolis, MN, for amici curiae Shakopee Mdewakanton Sioux Community, Grand Portage Band of Chippewa, Upper Sioux Community, Lower Sioux Indian Community, and Prairie Island Indian Community.

## OPINION

MEYER, Justice.

After parental rights to an Indian child living in Fillmore County were involuntarily terminated, the White Earth Band of Ojibwe (the Band) petitioned for transfer of the ensuing preadoptive placement proceedings to its tribal court. The district court granted the Band's motion and the court of appeals affirmed. Because we conclude that transfer of preadoptive proceedings to tribal court is not authorized by federal or state law, we reverse.

The subject of these proceedings is the sixth child of R.S. and L.S. L.S. is an enrolled member of the White Earth Band of Ojibwe; the district court record describes R.S. as Caucasian rather than Native American. The couple's five older children have been removed from parental care. Parental rights to the oldest child were involuntarily terminated in 1990; parental rights with respect to another child were permanently suspended by the White Earth Tribal Court in January 2010 in a case transferred from a district court in Iowa. Three of the couple's children remain in the custody of the Iowa Department of Human Services. Nothing in the record before us indicates that, at any time pertinent to these proceedings, either parent resided or was domiciled on the White Earth reservation. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (domicile of a minor child is determined by that of the child's parents).

In February 2010, Fillmore County petitioned the Fillmore County District Court under Minn.Stat. § 260C.301, subd. 1(b)(4) (2010) for termination of parental rights with respect to the couple's sixth child. Under subdivision 1(b)(4) of section 260C.301, a termination of parental rights for palpable unfitness is presumed if a parent's rights to another child have been involuntarily terminated. *See id.* The child was removed from parental custody and placed in third-party foster care; a guardian ad litem, who is the appellant here, was appointed for the child.

Fillmore County gave the White Earth Band of Ojibwe notice of the petition for termination of parental rights, as required by the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1912(a) (2006). In awarding the County temporary custody of the child,

the district court indicated that if the White Earth Tribal Court assumed jurisdiction of the matter before the admit/deny hearing on the County's petition, the district court matter would be dismissed. On February 22, 2010, the Band intervened in the proceedings but asked the district court not to transfer the case "at this point in the proceedings."

After a court trial in April 2010, at which a representative of the Band testified, the district court terminated parental rights with respect to the child on grounds of palpable unfitness, *see* Minn.Stat. § 260C.301, subd. 1(b)(4), and ordered that the child be placed with Fillmore County for preadoption proceedings.

About six weeks later, the Band moved to transfer jurisdiction of the preadoptive placement proceeding to its tribal court. The district court granted the Band's motion, over the objections of the guardian ad litem, under 25 U.S.C. § 1911(b) (2006).[1] The court held that although transfer of the preadoptive proceedings was not authorized under a literal reading of ICWA, Congress nevertheless intended to allow transfer in this situation because ICWA "as a whole" was intended to curtail state authority over Indian child custody matters. The court further held that a 2007 Tribal/State Agreement between the Minnesota Department of Human Services and 11 Minnesota tribes (including the Band), although not expanding the jurisdiction established by ICWA, supported the conclusion that the State and the Band had concurrent jurisdiction over the preadoptive proceedings. Finally, the court concluded that the guardian ad litem had

not established by clear and convincing evidence that there was good cause, within the meaning of 25 U.S.C. § 1911(b), to deny transfer to the tribal court.

On the appeal of the guardian ad litem, the court of appeals affirmed but on different grounds. *In re Welfare of the Child of R.S. and L.S.,* 793 N.W.2d 752, 761 (Minn. App.2011). The court of appeals held that ICWA neither requires nor prohibits transfer of preadoptive proceedings to tribal court, leaving the question to state sources of law. *Id.* at 759. The appellate court further held that transfer of jurisdiction over the preadoptive placement proceeding was a procedural matter, not a matter of substantive law, and therefore the Minnesota Rules of Juvenile Protection Procedure controlled over any conflicting statute. 793 N.W.2d at 761. The appellate court transferred the matter to the White Earth Tribal Court under Minn. R. Juv. Prot. P. 48.01, subd. 3, which provides in pertinent part: "Upon motion or request of an Indian child's parent, Indian custodian, or tribe pursuant to subdivision 1 [of Rule 48.01], the court shall issue an order transferring the juvenile protection matter to the Indian child's tribe absent objection by either parent . . . or a finding of good cause to deny transfer. . . ." 793 N.W.2d at 760.

■■■ We granted the guardian ad litem's petition for review. We review the lower courts' construction and application of rules of procedure de novo. *See Shamrock Dev., Inc. v. Smith,* 754 N.W.2d 377, 382 (Minn.2008) (civil procedure); *State v. Dahlin,* 753 N.W.2d 300, 305 (Minn.2008)

---

1. 25 U.S.C. § 1911(b) provides:
   In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such pro-

ceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided,* That such transfer shall be subject to declination by the tribal court of such tribe.

(criminal procedure); *In re GlaxoSmith-Kline PLC*, 699 N.W.2d 749, 753 (Minn. 2005) (civil appellate procedure). We similarly review de novo the lower courts' interpretation of statutes. *Imperial Developers, Inc. v. Calhoun Dev., LLC*, 790 N.W.2d 146, 148 (Minn.2010).

## I.

■ Under the Supremacy Clause, U.S. Const. art. VI, § 2, the decision to transfer jurisdiction of these preadoptive placement proceedings to the tribal court must meet the minimum requirements of the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901–1963 (2006).

Congress enacted ICWA in 1978 to address the "rising concern ... over the consequences ... of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Holyfield*, 490 U.S. at 32, 109 S.Ct. 1597. In 25 U.S.C. § 1911(a), Congress granted the tribal court "jurisdiction exclusive as to any State over *any child custody proceeding* involving an Indian child who resides or is domiciled within the reservation of such tribe" or who is a ward of the tribe. (Emphasis added.) Therefore, with respect to an Indian child who resides within or is domiciled within the child's tribe's reservation, state courts have no jurisdiction over any child custody proceeding.

With respect to an Indian child who does not reside and is not domiciled within the reservation of his or her tribe, ICWA establishes "minimum Federal standards" for proceedings in state courts. 25 U.S.C. § 1902. Those minimum standards require, for example, that the child's tribe be given notice of the proceedings, *id.* § 1912(a); that the child's tribe have the right to intervene, *id.* § 1911(c); and that

the parents of the Indian child, if indigent, have the right to court-appointed counsel, *id.* § 1912(b).

However, these minimum procedural standards differ depending on the particular type of proceeding at issue. For example, 25 U.S.C. § 1912(a) requires that the child's tribe be given notice of proceedings in two of the four defined types of child custody proceedings: foster care placement and termination of parental rights. *See* 25 U.S.C. § 1903(1) (defining four types of child custody proceedings: "foster care placement," "termination of parental rights," "preadoptive placement," and "adoptive placement"). Indeed, the statute forbids a foster care placement or termination of parental rights proceeding until at least ten days after the tribe receives such notice. 25 U.S.C. § 1912(a). But section 1912(a) does not require notice to the child's tribe in the two other types of child custody proceedings: preadoptive and adoptive placement proceedings.

Similarly, 25 U.S.C. § 1911(c) gives the child's tribe the right to intervene "at any point" in two of the four defined types of child custody proceedings—foster care placement and termination of parental rights—but does not give the child's tribe the right to intervene in state court proceedings for preadoptive or adoptive placement. 25 U.S.C. § 1912(c) gives each party the right to examine reports and other documents filed with the state court in a foster care placement or termination of parental rights proceeding, but does not extend that right in state court proceedings for preadoptive or adoptive placement. 25 U.S.C. § 1914 gives an Indian child and her parents the right to petition for invalidation of foster care placement or termination of parental rights upon a showing that the proceedings violated 25 U.S.C. §§ 1911, 1912, and 1913, but does

not extend such right to the invalidation of preadoptive or adoptive placement.

25 U.S.C. § 1911(b) provides for the transfer to tribal court of two of the four types of child custody proceedings—foster care placement and termination of parental rights:

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided*, That such transfer shall be subject to declination by the tribal court of such tribe.

The court of appeals concluded that 25 U.S.C. § 1911(b) is ambiguous with respect to the transfer to tribal court of preadoptive placement proceedings, and therefore the question of transfer of preadoptive proceedings to tribal court is to be resolved based on state law. 793 N.W.2d at 759–60. We conclude that 25 U.S.C. § 1911(b) is not ambiguous on the subject of transfer to tribal court of preadoptive proceedings involving an Indian child not residing or domiciled on the child's tribe's reservation. Rather, we conclude that ICWA does not permit the transfer of such proceedings. We further conclude that, even if 25 U.S.C. § 1911(b) were ambiguous, state law cannot create jurisdiction in the tribal court where federal law has not.

### A.

■ In 25 U.S.C. § 1911(a), Congress granted the tribal court "jurisdiction exclusive as to any State over *any child custody proceeding* involving an Indian child who resides or is domiciled within the reservation of such tribe" or who is a ward of the tribe. (Emphasis added.) Therefore, with respect to an Indian child who resides within or is domiciled within the child's tribe's reservation, state courts have no jurisdiction over any child custody proceeding.

■ But the child who is the subject of these proceedings and the child's parents all resided in Fillmore County. Moreover, neither the child nor the child's parents are domiciled on the White Earth reservation, and the district court record indicates that R.S. is not Native American. As a result, the tribal court lacked inherent jurisdiction over the termination of parental rights proceedings. *See Montana v. United States*, 450 U.S. 544, 566, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (tribe lacked inherent power to regulate activities of non-tribal members on non-Indian land); 25 U.S.C. § 1302(a)(8) (2006) (requiring due process of law in Indian tribal court proceedings).

Therefore, the tribal court could assume jurisdiction over the proceeding, if at all, only by Congressional grant. 25 U.S.C. § 1911(b) provides:

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer each proceeding to the jurisdiction of the tribe, absent objection by either parent upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided*, That such transfer shall be subject to declination by the tribal court of such tribe.

We are persuaded that Congress did not intend to permit the transfer of adoptive and preadoptive placement proceedings to

tribal courts. We cannot assume that, having specifically used a term in section 1911(a)—"child custody proceeding"—that *includes* preadoptive and adoptive proceedings, Congress was simply careless in using terms in section 1911(b)—"foster care placement" and "termination of parental rights"—that *exclude* preadoptive and adoptive placement proceedings. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.").

Rather, we are bound by the plain language of the statute. Under the plain language of 25 U.S.C. § 1911(b), tribal courts have presumptive jurisdiction over two types of child custody proceedings—foster care placement and termination of parental rights—involving Indian children who do not reside and are not domiciled on their tribe's reservation. But, again under the plain language of 25 U.S.C. § 1911(b), Congress has not granted tribal courts jurisdiction over preadoptive and adoptive placement proceedings involving Indian children who do not reside and are not domiciled on their tribe's reservation. Where a statute is clearly limited to specifically enumerated subjects, we do not extend its application to other subjects by process of construction. *Martinco v. Hastings,* 265 Minn. 490, 495, 122 N.W.2d 631, 637 (1963).

■ The court of appeals concluded that because section 1911(b) neither expressly requires nor expressly prohibits transfer of other types of child custody proceedings—preadoptive and adoptive placement proceedings—the statute was ambiguous. 793 N.W.2d at 757. We disagree. "[S]ilence in a statute regarding a particular topic does not render the statute unclear

or ambiguous unless the statute is susceptible of more than one reasonable interpretation." *Premier Bank v. Becker Dev., LLC,* 785 N.W.2d 753, 760 (Minn.2010). Moreover, we do not read the differing language in the two subsections as congressional "silence." Rather, we read the differing language as drawing an express distinction between foster care and termination of parental rights proceedings on the one hand, and preadoptive and adoptive placement proceedings on the other.

The differing language in the two subsections cannot be read in isolation from the other provisions of ICWA. *See State v. Gaiovnik,* 794 N.W.2d 643, 647 (Minn. 2011) ("When interpreting statutes, we do not examine different provisions in isolation.") We construe statutes "as a whole" and "in the light of their context." *See Christensen v. Hennepin Transp. Co., Inc.,* 215 Minn. 394, 409, 10 N.W.2d 406, 415 (1943). As discussed above, Congress distinguished among the four types of child custody proceedings—foster care placement, termination of parental rights, preadoptive placement, and adoptive placement—throughout ICWA. For example, it required the "testimony of qualified expert witnesses" in foster care placement and termination of parental rights proceedings, but not in preadoptive and adoptive placement proceedings. 25 U.S.C. § 1912(e), (f). It allowed for the invalidation of foster care placement and termination of parental rights for violation of certain procedural provisions of ICWA, but did not permit the invalidation of preadoptive or adoptive placements. 25 U.S.C. § 1914. It gave the child's tribe the right to notice and intervention in foster care and termination proceedings, but not adoption proceedings. *See* 25 U.S.C. §§ 1911(b), 1912(a). These distinctions support our conclusion that in 25 U.S.C. § 1911(b), Congress intended to limit the types of

child custody proceedings that can be transferred to tribal courts to foster care placement and termination of parental rights.

■ The dissent relies upon an extensive and well-researched history of the treatment of Indian children to support its interpretation of section 1911(b). But such an historical recitation is extrinsic evidence, and we do not turn to extrinsic evidence to interpret a statute unless it is, in the first instance, ambiguous. *Feick v. State Farm Mut. Auto. Ins. Co.*, 307 N.W.2d 772, 775 (Minn.1981) (holding that in the absence of any ambiguity in the express language of a statute, resort to extrinsic aids to determine legislative intent is unnecessary and improper). The dissent fails to point out any ambiguity in the express language of section 1911(b). Moreover, extrinsic evidence can be used only to resolve existing statutory ambiguity; it cannot be used to create ambiguity where none exists. *Knopp v. Gutterman*, 258 Minn. 33, 40, 102 N.W.2d 689, 695 (1960).

In addition, section 1911(b) requires transfer "upon the petition of either parent or the Indian custodian." But once the case has progressed to preadoptive or adoptive placement, parental rights have necessarily been terminated. The dissent's expansive reading of section 1911(b) would grant the Indian child's parents standing to petition the state court for transfer, even though their parental rights have been terminated and they are no longer parties to the state court proceedings. *See* Minn.Stat. § 260C.317, subd. 1 (2010) (providing that upon termination of parental rights "the parent shall have no standing to appear at any further legal proceeding concerning the child").

Other courts have considered whether transfer of preadoptive and adoptive placement proceedings to tribal courts is per-

mitted by section 1911(b), and come to differing conclusions. But courts that have concluded that transfer of preadoptive and adoptive placement proceedings to tribal courts is permitted have done so only by disregarding the plain language of ICWA in favor of "the intended purpose of the act." *See In re M.S. and K.S.*, 237 P.3d 161, 165 (Okla.2010). For example, in *In re M.S. and K.S.*, the Oklahoma Supreme Court required transfer of preadoptive placement proceedings involving two Indian children not residing on the reservation, despite the language of section 1911(b), based on "[c]ongressional intent and the purpose of the ICWA." 237 P.3d at 165. That purpose, the Oklahoma court noted, is stated in ICWA itself:

> The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

*Id.* at 165–66 n. 9 (quoting 25 U.S.C. § 1902).

We do not agree with the Oklahoma court that congressional policy regarding Indian tribes and families is not served by keeping a preadoptive placement proceeding in state court. ICWA establishes certain preferences for the placement of Indian children in foster and adoptive homes. *See* 25 U.S.C. § 1915(b). For example, preference is to be given in foster care or preadoptive placements, in the absence of good cause to the contrary, first to "a member of the Indian child's extended family" and then to "a foster home li-

censed, approved, or specified by the Indian child's tribe." *Id.* Preferences apply only to adoptive placements made by the state courts. 25 U.S.C. § 1915(a) ("In any adoptive placement of an Indian child under State law . . . ."). Moreover, where the child's tribe has established a different order of preference, the state court is obligated to follow that order of preference "so long as the placement is the least restrictive setting appropriate to the particular needs of the child." 25 U.S.C. § 1915(c). It is therefore not necessary to transfer a preadoptive or adoptive placement proceeding to tribal court in order to assure that "placement of [Indian] children in foster or adoptive homes . . . will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

In contrast, courts that have hewn to the plain language of section 1911(b) have concluded that section 1911(b) does not permit the transfer of preadoptive and adoptive placement proceedings. *In re A.P.*, 289 Mont. 521, 962 P.2d 1186, 1190 (1998); *In re J.B.*, 900 P.2d 1014, 1016 (Okla.App. 1995), *overruled by In re M.S. and K.S.*, 237 P.3d at 167.

We conclude that 25 U.S.C. § 1911(b) is not ambiguous and, with respect to an Indian child not residing or domiciled on his or her tribe's reservation, permits transfer to tribal court of only foster care placement and termination of parental rights proceedings. We therefore reverse the court of appeals and remand the matter to the district court for reinstatement of the preadoptive placement proceedings and reappointment of a guardian ad litem for the child.

B.

■ The court of appeals concluded that because 25 U.S.C. § 1911(b) is ambiguous with respect to the transfer of preadoptive and adoptive placement proceedings, Con-

gress intended "other state sources of law [to] authorize the transfer of preadoptive-placement proceedings to Indian tribes with concurrent jurisdiction." 793 N.W.2d at 760. Although not essential to our resolution of the case, we nevertheless address this aspect of the court of appeals' opinion.

As we have noted, because one of the child's parents is neither Native American nor resided on or was domiciled on the White Earth reservation, the White Earth tribal court lacked jurisdiction over the proceedings for termination of parental rights. *See Montana,* 450 U.S. at 566, 101 S.Ct. 1245 (tribe lacked inherent power over the activities of non-tribal members on non-Indian land). The parties cite no case (and we have found none) in which a tribal court had jurisdiction over preadoptive or adoption placement proceedings concerning an Indian child who neither resided on nor was domiciled on the tribe's reservation. *Cf. Fisher v. Dist. Court,* 424 U.S. 382, 389, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) (jurisdiction of tribal court over proceedings for adoption of Indian child residing on the reservation is exclusive).

Respondents contend that 25 U.S.C. § 1919(a), by authorizing states and tribes to enter into agreements regarding jurisdiction over proceedings involving Indian children, permits Minnesota and the White Earth Band of Ojibwe to agree to the transfer of these preadoptive proceedings even if section 1911 does not. We disagree.

The question before the court of appeals in this case was not the transfer of preadoptive placement proceedings to a tribal court with concurrent jurisdiction, but the endowment of the tribal court with jurisdiction. 25 U.S.C. § 1919(a) provides:

States and Indian tribes are authorized to enter into agreements with each other respecting care and custody of Indian children and jurisdiction over

child custody proceedings, including agreements which may provide for orderly transfer of jurisdiction on a case-by-case basis and agreements which provide for concurrent jurisdiction between States and Indian tribes.

Section 1919(a) allows states and tribes to agree to "orderly transfer of jurisdiction" and "concurrent jurisdiction." But nothing in the plain language of section 1919(a) allows states and tribes to create tribal jurisdiction where none previously existed.

Minnesota, claiming authority under 25 U.S.C. § 1919, authorized the Commissioner of Human Services to enter into agreements with Minnesota tribes:

> The commissioner is hereby authorized to enter into agreements with Indian tribes pursuant to [25 U.S.C. § 1919] respecting care and custody of Indian children and jurisdiction over child custody proceedings, including agreements which may provide for orderly transfer of jurisdiction on a case-by-case basis and agreements which provide for concurrent jurisdiction between the state and an Indian tribe.

Minn.Stat. § 260.771, subd. 5 (2010). The Commissioner and 11 Minnesota tribes entered into such an agreement in 1998. The parties amended the agreement in 2007. *See* 2007 *Indian Child Welfare Tribal/State Agreement* (Minn. Dep't of Human Servs. Feb.2007) *available at* https://edocs.dhs.state.mn.us/lfserver/Legacy/DHS–5022–ENG.

■ We conclude, for two reasons, that the 2007 Tribal/State Agreement also does not provide authority for transfer of pre-adoptive and adoption placement proceedings. First, the 2007 Tribal/State Agreement itself disavows any intent to change the jurisdictional provisions of ICWA "in any manner." 2007 Tribal/State Agreement at 4. As we have explained above, ICWA does not authorize the transfer of preadoptive or adoptive placement proceedings to tribal court when the child neither resides on nor is domiciled on the reservation.

Second, Minn.Stat. § 260.771, subd. 5—the statute authorizing the Commissioner of Human Services to enter into the 2007 Tribal/State Agreement—cannot be interpreted as granting the Department of Human Services, an executive-branch agency, the power to expand or contract the jurisdiction of either the state courts or the tribal courts. Under Minn. Const. art. III, § 1:

> The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution.

The Legislature can delegate legislative *functions,* but not legislative *power.* *Minn. Pollution Control Agency v. Hatfield,* 294 Minn. 260, 267, 200 N.W.2d 572, 576 (1972). We explained the difference between legislative functions and legislative power in *State ex rel. Interstate Air-Parts, Inc. v. Metropolitan Airports Commission,* 223 Minn. 175, 190, 25 N.W.2d 718, 728 (1947): legislative function "requires action prescribed by law," whereas legislative power "involves the power to make law." Under this test, the power to prescribe the jurisdiction of the district court is "the power to make law," a power that the Legislature cannot constitutionally delegate.

The provision of the 2007 Tribal/State Agreement requiring transfer of "any child placement/custody proceedings," 2007 Tribal/State Agreement at 6, is therefore void to the extent that it purports to re-

quire transfer of preadoptive and adoptive placement proceedings involving an Indian child not residing or domiciled on the reservation of the child's tribe. The parties point us to no other authority for transfer of such preadoptive and adoptive placement proceedings, and we have found none. We conclude that with respect to an Indian child not residing or domiciled on the child's tribe's reservation, transfer is limited to foster care placement and termination of parental rights proceedings.

## II.

The court of appeals further concluded that because 25 U.S.C. § 1911(b) neither prohibited nor permitted transfer of preadoptive placement proceedings to tribal court, transfer was authorized by Rule 48.01 of the Rules of Juvenile Protection Procedure. 793 N.W.2d at 761. Because we reverse the court of appeals as to its interpretation of section 1911(b), the authority for transfer under Rule 48 is not essential to our resolution of the case. We nevertheless address the issue because of its importance.

Rule 48.01, subd. 3, Minn. R. Juv. Prot. P., provides:

> Upon motion or request of an Indian child's parent, Indian custodian, or tribe pursuant to subdivision 1 [of Rule 48.01], the court shall issue an order transferring the juvenile protection matter to the Indian child's tribe absent objection by either parent pursuant to subdivision 4 [of Rule 48.01] or a finding of good cause to deny transfer pursuant to subdivision 6(b) [of Rule 48.01], and shall proceed pursuant to Rule 48.02 [regarding communication between the district court and the tribal court]. The order transferring the juvenile protection matter to the Indian child's tribe shall order jurisdiction of the matter retained pursuant to subdivision 7 [of Rule 48.01]

until the Indian child's tribe exercises jurisdiction over the matter.

▬▬ The court of appeals concluded that Rule 48.01 was procedural, rather than substantive, and therefore controlled over any conflicting statute. 793 N.W.2d at 761. Purely procedural rules do prevail over contradictory statutes. *See In re Welfare of J.R., Jr.,* 655 N.W.2d 1, 3 (Minn.2003). But the rules of procedure we promulgate are "limited to governing the procedure in the ... courts of this state" and cannot "in any respect ... legislate where substantive law is involved." *Anderson v. Twin City Rapid Transit Co.,* 250 Minn. 167, 184, 84 N.W.2d 593, 604 (1957); *see also* Minn.Stat. § 480.051 (2010) (authorizing the supreme court "to regulate the pleadings, practice, procedure, and the forms thereof in civil actions in all courts of this state" but providing that "[s]uch rules shall not abridge, enlarge, or modify the substantive rights of any litigant").

▬▬ "Substantive law is that part of law which creates, defines, and regulates rights, as opposed to 'adjective or remedial law,' which prescribes method[s] of enforcing the rights or obtaining redress for their invasion." *Anderson,* 250 Minn. at 184 n. 7, 84 N.W.2d at 604 n. 7 (quoting *Black's Law Dictionary* 1598 (4th ed.1968)). In contrast, procedural law "neither creates a new cause of action nor deprives defendant of any defense on the merits." *Stern v. Dill,* 442 N.W.2d 322, 324 (Minn.1989) (quoting *Strauch v. Superior Court,* 107 Cal.App.3d 45, 165 Cal. Rptr. 552, 554 (1980)).

We conclude that transfer of preadoptive placement proceedings to tribal court would create, define, and regulate the rights of the parties. For example, the state court proceeding is subject to the adoption placement preferences established by ICWA, but a tribal court pro-

ceeding is not. *See* 25 U.S.C. § 1915(a) (establishing placement preferences for "any adoptive placement of an Indian child *under State law*" (emphasis added)). Furthermore, the Band asserts that it only suspends—and does not terminate—parental rights, suggesting that R.S. and L.S. may have some rights in a tribal court proceeding for preadoptive or adoptive placement, even though parental rights were terminated by the state court. Because transfer of the preadoptive placement proceeding to tribal court would create, define, and regulate the rights of the parties, we conclude that Rule 48.01 is substantive, not procedural, with respect to preadoptive and adoption placement proceedings.

To the extent that the transfer provision of Rule 48.01 is substantive, it is therefore effective only if some other source of law authorizes transfer. As we have explained above, transfer of preadoptive and adoption placement proceedings is not authorized under ICWA. We conclude that with respect to an Indian child not residing or domiciled on the child's tribe's reservation, Rule 48 of the Minnesota Rules of Juvenile Protection Procedure, providing for transfer of "the juvenile protection matter" to an Indian child's tribe, is limited to foster care placement and termination of parental rights proceedings.

We therefore reverse the court of appeals and remand the matter to the district court. On remand, the district court shall reopen its file, shall reappoint a guardian ad litem for the child, and shall proceed with the preadoptive placement of the child, respecting the placement preferences of 25 U.S.C. § 1915.

Reversed and remanded.

STRAS, J., took no part in the consideration or decision of this case.

DIETZEN, Justice (concurring).

The majority concludes, and I agree, that 25 U.S.C. § 1911(b) (2006) is not ambiguous and, as relates to Indian children not residing or domiciled on their tribe's reservation, permits transfer to tribal court of only foster care placement and termination of parental rights proceedings. But the majority goes on to address issues "not essential to our resolution of the case," including the validity of a portion of the 2007 Tribal/State Agreement (part IB) and the interpretation of Rule 48 of the Minnesota Rules of Juvenile Protection Procedure (part II). In doing so, the majority overreaches and, by its own admission, addresses issues that are not essential to the decision to reverse the court of appeals and remand the case to the district court.

Previously, we have relied on judicial restraint to decline to address issues "not essential to the disposition of the particular controversy before us." *Lipka v. Minn. Sch. Emps. Ass'n,* 550 N.W.2d 618, 622 (Minn.1996); *see also Navarre v. S. Washington Cnty. Sch.,* 652 N.W.2d 9, 32 (Minn.2002) (declining to reach issue of attorney misconduct because other errors entitled appellant to a new trial). We exercise judicial restraint to avoid deciding issues unnecessary to the resolution of the controversy and to avoid issuing advisory opinions. *Lipka,* 550 N.W.2d at 622.

Moreover, the majority's reliance on the "importance" of the issue in part II to support addressing Rule 48 of the Minnesota Rules of Juvenile Protection Procedure is not a recognized exception to the principle of judicial restraint. While we have made exceptions to judicial restraint, those exceptions are made in the interests of judicial economy to guide the district court and the parties on remand. *J.E.B. v. Danks,* 785 N.W.2d 741, 751–52 (Minn. 2010); *State ex rel. Haak v. Bd. of Educ.*

*of Indep. Sch. Dist. No. 625,* 367 N.W.2d 461, 467 (Minn.1985). Here, the majority's resolution of parts IB and II is not needed to guide the court or the parties on remand. Thus, this exception is not applicable.

Because the conclusions reached in parts IB and II are not essential to the disposition of the case, the court should decline to reach those issues. The court's consideration of those issues is dictum and not binding on the court. *State v. Hess,* 684 N.W.2d 414, 421 n. 6 (Minn.2004) ("Considerations made in a judicial opinion that are unnecessary to the decision in the case are dicta."). Accordingly, I agree with part IA of the opinion, and that the matter should be reversed and remanded solely on that basis. But I do not join parts IB and II of the majority opinion.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. In July 1970, President Richard M. Nixon clearly and concisely stated the rationale for breaking from America's long and tortured history of mistreatment of its native inhabitants [1]:

> From the time of their first contact with European settlers, the American Indians have been oppressed and brutalized, deprived of their ancestral lands and denied the opportunity to control their own destiny. Even the Federal programs which are intended to meet their needs have frequently proved to be ineffective and demeaning.

President Richard M. Nixon, Special Message on Indian Affairs to Congress, 213 Pub. Papers 564, 564 (July 8, 1970). During an era in which federal officials generally supported one of two competing approaches for engaging with Indians— termination or paternalism—President Nixon proposed a third approach: self-governance. Nixon explained:

> It is long past time that the Indian policies of the Federal government began to recognize and build upon the capacities and insights of the Indian people. Both as a matter of justice and as a matter of enlightened social policy, we must begin to act on the basis of what the Indians themselves have long been telling us. The time has come to break decisively with the past and to create the conditions for a new era in which the Indian future is determined by Indian acts and Indian decisions.

*Id.*[2]

In 1978, changing federal sentiment toward Indians and recognition that state

---

1. *See* Justice Stephen Breyer, *"For Their Own Good": The Cherokees, the Supreme Court, and the Early History of American Conscience,* New Republic, Aug. 7, 2000, at 32 (describing the "sad tale" of the several actions at law before the United States Supreme Court that ultimately resulted in the Cherokee Indian Tribes' forced westward exodus from its home in Georgia, a migration that has been labeled the "Trail of Tears").

2. More than two decades before President Nixon made these remarks, Minnesota's Republican Governor Luther W. Youngdahl advised our own state to improve its treatment of American Indians. In the late 1940's, as Governor Youngdahl advanced his "humanity agenda" for our state, he proclaimed that "all races must quickly learn to cooperate according to principles of justice or perish," and then challenged the "dominant white group" in Minnesota to "set the example by correcting wrongs done to the Indian." David Beaulieu, *A Place Among Nations: Experiences of Indian People, in* Minnesota in a Century of Change: The State and Its People Since 1900 397, 418 (Clifford E. Clark ed., 1989). Before being elected governor in November 1946, Youngdahl served as a Hennepin County municipal and district court judge (1930–1942) and as an associate justice on the Minnesota Supreme Court (1942–1946). In 1951, Youngdahl resigned his position as governor to accept an appointment as a federal judge

policies and procedures were destroying Indian families and communities culminated in the passage of the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901–1963 (2006). At the "heart of [ICWA]" are its provisions protecting tribal sovereignty and jurisdiction over Indian child custody matters. *Miss. Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 36, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). Because the majority undercuts the very essence of ICWA by precluding tribal jurisdiction in a significant subset of child custody proceedings, I dissent.

I find nothing in the plain language of 25 U.S.C. § 1911(b) that prevents transfer of preadoptive and adoptive placement proceedings to a tribal court in cases involving Indian children who do not reside and are not domiciled on their tribe's reservation. Instead, I conclude that, when read as part of ICWA's overall scheme favoring tribal jurisdiction and self-determination, § 1911(b) vests in tribal courts concurrent jurisdiction over preadoptive and adoptive placement proceedings of nondomiciliary Indian children. ICWA's language and structure, the history behind the Act, and clear statements of legislative intent all support this reading. Unlike the majority, I would hold that the district court properly granted the motion of the White Earth

Band of Ojibwe (the child's tribe) to transfer this child custody case to tribal court. Therefore, I would affirm the decisions of both the district court and the court of appeals.

## I.

To fully understand the import of ICWA, a brief historical recounting of our nation's treatment of Indian children is needed. In the late 1800's, federal and state governments began focusing their efforts on assimilation; at the time, the prevailing view was that the well-being of Indian children depended on rejection of "savage" ways and acceptance of the "blessings of modern civilization." *See, e.g.,* Mery M. Meline, *Educating the Indians,* 19 Frank Leslie's Popular Monthly 724, 726 (1885).

Captain Richard Henry Pratt led the assimilation movement. Pratt believed that Indian children should be separated from their families and educated at boarding schools. In 1879, Pratt opened the Carlisle Indian Industrial School in Carlisle, Pennsylvania, and developed a curriculum that included teaching the English language, Christianity, and "American" values to Indian children.[3] To further encourage assimilation, the curriculum precluded children from speaking their native

---

in the District of Columbia. Youngdahl served on the federal bench until shortly before his death in 1978.

**3.** In a recent article, Judge Timothy Connors examined the legacy of the Carlisle School:

> For ... 40 years, over 10,000 Indian children were taken from their families and sent to Carlisle. Only 761 actually graduated. "Returning to the blanket," a term used to describe the resumption of traditional life, was seen as a sign of great failure. But more disturbing were the statistics of those who never returned. Six boxes, catalogued as "dead files," sit in the National Archives. These boxes contain the

names of the children who died at Carlisle or shortly after their return home. The published reports indicate children were dying at a rate of three times the national average. Researchers suggest that these published reports were sanitized.

Judge Tim Connors, *Our Children Are Sacred,* 50 Judges' J. 33, 34 (2011). Judge Connors presently serves as a state Circuit Court judge in Ann Arbor, Michigan. Judge Connors is also an Adjunct Professor at Wayne State University Law School and is a lecturer on the University of Michigan Law School faculty and at the Thomas M. Cooley Law School, Ann Arbor campus. He teaches Civil Trial Skills, Family Law, Family Trial Skills, and American Indian Law.

languages, practicing their spiritual beliefs, and adhering to their traditional grooming and attire. *See* B.J. Jones, *In Their Native Lands: The Legal Status of American Indian Children in North Dakota*, 75 N.D. L.Rev. 241, 247–48 (1999).

Shortly after the establishment of the Carlisle School, the United States government began funding assimilation education programs around the country.[4] Most of these programs followed the Pratt model: students were to "[q]uit being an Indian." Sally Jenkins, *The Real All Americans: The Team that Changed a Game, a People, a Nation* 121 (2007).

Nearly 100 years later, a paradigm shift was occurring in federal policies affecting Native Americans; but, at the same time Congress was debating ICWA, the cultural biases that had fueled assimilation continued to permeate local treatment of Indian children. At a congressional hearing on ICWA in 1974, Senator James Abourezk decried both public and private welfare agencies that "seem[ed] to" operate under "the premise that most Indian children would really be better off growing up non-Indian," and a juvenile justice system that ignored the "all-important demands of Indian tribes to have a say in how their children and families are dealt with." *Indian Child Welfare Program: Hearings Before the Subcomm. on Indian Affairs of the Comm. on Interior and Insular Affairs*, 93d Cong. 1–2 (1974) [hereinafter *1974 Hearings*].

Tragically, removal of Indian children from their homes continued at highly disproportionate rates: by the mid–1970s, about 25 percent of all Indian children were in state foster care systems or adoptive homes. 95 Cong. Rec. 38,102 (1978). In states such as South Dakota, Washington, and Wisconsin, Indian children were at least 10 times more likely than non-Indian children to be separated from their parents through foster care or adoption.[5] H.R.Rep. No. 95–1386, at 9 (1978). In congressional testimony, William Byler, the Executive Director of the Association on American Indian Affairs, described the outplacement of Indian children as "the most tragic aspect of Indian life today." *1974 Hearings, supra*, at 3.

Even more disconcerting to many in Congress than the removal numbers for Indian children was the placement data. Statistics presented to Congress not only showed that "Indian children [were] being removed from their families at alarming rates, but they also show[ed] that in the overwhelming majority of the cases, the children are placed in non-Indian homes." 95 Cong. Rec. 38,102. Nationwide, about 85 percent of Indian children were placed in either a white foster home or white

---

4. In 1891, Congress passed the first major bill funding schooling for Indian children. *See* 26 Stat. 989, 1012 (1891). The bill appropriated $1 million to "Indian day and Industrial schools," including $110,000 for the Carlisle School and $30,000 for Indian schools in Minnesota. *See id.* at 1012–13 ("For education and support of one hundred Chippewa boys and girls at Saint John's University and at Saint Benedict's Academy, in Stearn's County, State of Minnesota ... and for the education and support of one hundred Indian pupils at Saint Paul's Industrial school at Clontarf, in the State of Minnesota, thirty thousand dollars.").

5. The numbers reported to Congress from Minnesota were no less staggering. Indian children were being placed in foster and adoptive homes at five-times the rate of non-Indian children. *1974 Hearings, supra*, at 3. In 1971–1972, "nearly one in every four infants under one year of age was placed for adoption," and by 1974, one in eight Indian children under 18 was in an adoptive home. *Holyfield*, 490 U.S. at 33, 109 S.Ct. 1597 (citing *1974 Hearings, supra*, at 3, 15 (statement of William Byler)). More than 90 percent of those adopted ended up in non-Indian homes. *Id.*

adoptive home. *Id.* "Indian tribes and Indian people," proclaimed House sponsor Mo Udall, "are being drained of their children...." *Id.*

Congress heard a myriad of theories explaining the highly disproportionate removal and placement statistics, but during floor debates and in congressional reports, members of Congress focused on one concrete explanation: state welfare and juvenile justice systems were plagued by ignorance, prejudice, and misunderstanding. "[M]any social workers, ignorant of Indian cultural values and social norms, make decisions that are wholly inappropriate in the context of Indian family life...." H.R.Rep. No. 95–1386, at 10. According to Representatives Udall and Robert Lagomarsino, the inability—or unwillingness—of state agencies, officials, and courts to understand or fairly consider the different cultural and social norms in Indian communities and families was the cause of the high outplacement rates.[6]  95 Cong. Rec. 38,102 (statements of Reps. Udall and Lagomarsino).

Largely in response to what it deemed the unacceptable removal and placement practices by state and local authorities, Congress in 1978 enacted the Indian Child Welfare Act with a strong mandate to the states. First, Indian families were to have a definite role in the raising of Indian children. *See* 25 U.S.C. §§ 1901–02. "[T]here is no resource," Congress reso-

lutely declared, "more vital to the continued existence and integrity of Indian tribes than their children." *Id.* § 1901(3); *see also* Connors, *supra*, at 33 (" 'When you are working with our children, it is sacred work. Our children are sacred.' " (quoting Tribal Court Judge to National Council of Juvenile and Family Court Judges, Tribal Judicial Leadership Gathering, Dec. 2010)). Congress stated that the purpose of ICWA was

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture....

25 U.S.C. § 1902.

Second, Indian tribes were to have either exclusive or presumptive jurisdiction over child custody disputes involving Indian children. *See Holyfield*, 490 U.S. at 36, 109 S.Ct. 1597. According to one commentator, Congress came to almost "universal agreement that sovereignty was the solution to the Native American child welfare crisis," and Congress intended for the tribes themselves to end the problematic outplacement of Indian children. Jeanne Louise Carriere, *Representing the Native American: Culture, Jurisdiction, and the*

---

**6.** In statements before the Indian Affairs and Public Lands Subcommittee of the House, Chief Calvin Isaac of the Mississippi Band of Choctaw Indians explained the high rates of outplacement of Indian children:

> One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child. Removal is generally accomplished without notice to or consultation with responsible tribal authorities.

*Hearings on S. 1214 Before the Subcomm. on Indian Affairs and Public Lands of the Comm. on Interior and Insular Affairs*, 95th Cong. 191–92 (1978) [hereinafter *1978 Hearings* ].

*Indian Child Welfare Act,* 79 Iowa L.Rev. 585, 608 (1994).

ICWA not only represented a paradigm shift in federal policy toward Indians; it was also an admission that the time had come to end our nation's systematic destruction of Indian families and tribal communities. Congress viewed self-determination and tribal jurisdiction as essential protections for Indian tribes and Indian children. *See* 25 U.S.C. § 1901(3). In ICWA, Congress "expressed its clear preference for . . . deferring to tribal judgment on matters concerning the custody of tribal children." Guidelines for State Courts; Indian Child Custody Proceedings, Department of Interior, Bureau of Indian Affairs, 44 Fed.Reg. 67,584, 67,585 (Nov. 26, 1979) [hereinafter *BIA Guidelines*]. Unfortunately, in the Indian child custody case before us today, the majority ignores this "clear preference."

## II.

Resolution of the Indian child custody case before us depends on our interpretation of 25 U.S.C. § 1911(b). Section 1911(b) addresses jurisdiction in "foster care placement" and "termination of parental rights" proceedings for nondomiciliary Indian children:

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such pro-

ceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided,* That such transfer shall be subject to declination by the tribal court of such tribe.

The majority concludes that because Congress did not include "preadoptive placement" and "adoptive placement" proceedings in section 1911(b), the statute precludes transfer of these proceedings to the appropriate tribal court.[7] But the plain language of the statute does not mandate this result; rather, it points in a different direction.

Nothing in the language of ICWA indicates that state courts may only grant transfers to tribal courts in the circumstances explicitly addressed by section 1911. On the contrary, the text of ICWA evinces Congress's attempt to establish "minimum Federal standards" for the placement of Indian children "in foster *or adoptive* homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902 (emphasis added).[8] Although section 1911(b) lists a number of circumstances when state courts may transfer jurisdiction, it does not, as the majority reads it, list the only occasions when a state court may transfer jurisdiction. In the only United States Supreme Court case to address ICWA, the Court agreed with this reading when the Court said, " 'ICWA designates the tribal court as the exclusive forum for the determination of custody and adoption matters for

---

7. 25 U.S.C. § 1903(1) lists four types of "child custody proceedings": "foster care placement," "termination of parental rights," "preadoptive placement," and "adoptive placement."

8. The majority misreads section 1902 as establishing " 'minimum Federal standards' " only for "proceedings in state courts." The

provisions of ICWA broadly protect Indian children, families, and tribes under all federal and state law. *See, e.g.,* 25 U.S.C. § 1911(a) (providing exclusive jurisdiction to tribal courts in certain Indian child custody proceedings); *id.* § 1921 (protecting the rights of the parents and Indian custodians of Indian children under state and federal law).

reservation-domiciled Indian children, and *the preferred forum for nondomiciliary Indian children.'*" *Holyfield,* 490 U.S. at 52–53, 109 S.Ct. 1597 (quoting *In re Adoption of Halloway,* 732 P.2d 962, 969–70 (Utah 1986) (emphasis added)).

Further, our court has previously explained that section 1911(b) recognizes "concurrent but presumptively tribal jurisdiction" in all child custody cases involving a nondomiciliary Indian child. *In re Welfare of Child of T.T.B. & G.W.,* 724 N.W.2d 300, 305 (Minn.2006). That the majority reaches its conclusion based on the "plain language" of section 1911(b) is even more striking considering that the appellant— the child's guardian ad litem—concedes in her Reply Brief that section 1911(b) does not expressly prohibit transfer of preadoptive and adoptive placement proceedings to tribal courts.

The majority concludes that because section 1911(b) provides standards for a transfer only in "[s]tate court proceeding[s] for the foster care placement of, or termination of parental rights to," a nondomiciliary child, the provision permits transfer to tribal courts *only* in these two types of proceedings. By reading what is *included* in section 1911(b), the majority also apparently finds "plain language" indicating what is *excluded* by the section. Yet, the majority points to no words in the statute supporting its conclusion (e.g., "exclude," "preclude," and "only" are not found in section 1911(b)). Essentially, the majority's interpretation of section 1911(b) reads language into the statute that is not there.

Taken to its logical extension, the majority's reading of ICWA produces results that are contrary to our rules and case law. For example, 25 U.S.C. § 1912(c) protects the right of "[e]ach party to a foster care placement or termination of parental rights proceeding under State law

involving an Indian child" to "examine all reports or other documents filed with the court upon which any decision with respect to such action may be based." The majority's reading of ICWA means that section 1912(c) permits review of these records *only* in foster care and termination of parental rights proceedings but not in adoptive and preadoptive placement proceedings. *But see* Minn.Stat. § 259.53, subd. 3(b) (2010) (providing that a judge may, in his discretion, disclose to a party to an adoption proceeding "any portion of a report or record that relates only to the suitability of the proposed adoptive parents"). Similarly, 25 U.S.C. § 1911(c) protects the rights of an Indian custodian or tribe to "intervene at any point" in any state court proceeding for the foster care placement of, or termination of parental rights to, an Indian child. Yet, under the majority's view, section 1911(c) would prevent an Indian custodian or Indian tribe from intervening in any adoption or preadoption proceeding in state court, regardless of their interest in the case. *But see* Minn. R. Civ. P. 24.01 (providing that intervention will be granted upon the timely application of any interested party).

Just last year, the Supreme Court of Oklahoma addressed the same question at issue here and came to the opposite conclusion from the majority. *In re M.S. & K.S.,* 237 P.3d 161 (Okla.2010). The majority accuses the Oklahoma court of "disregarding the plain language of ICWA," but a close reading of *M.S. & K.S.* shows that the opposite is true. The court in *M.S. & K.S.* "read [section] 1911(b) as it is written" and found no language that excludes transfers of preadoptive and adoptive placement proceedings to tribal court. *Id.* at 165 ("Reading what **is** contained in [section 1911(b) ] does not require us to read into the statute what **is not** there, i.e., that transfers may **only be granted** if

requested before a termination of parental rights proceeding is concluded." (emphasis in original)). The Oklahoma court properly considered the entire text of ICWA,[9] including the declaration of policy stated in section 1902, and concluded that section 1911(b) cannot be read "to preclude tribal court jurisdiction." *Id.* at 166.

According to the majority, ICWA's historical backdrop has little or no relevancy to its interpretation. But this backdrop should not be ignored because context is important to any effort to interpret and understand ICWA. Congress was addressing a national problem, specifically, a failure by states to "recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(5). Rather than establish a complete set of federal rules of procedure for all child custody proceedings involving Indian children, Congress allowed states to retain their inherent authority over child custody proceedings but made that authority subject to "minimum Federal standards." *Id.* § 1902. It cannot be disputed that, under the Supremacy Clause, ICWA is the "supreme law of the land," and states are required to protect all of the rights that the statute establishes. U.S. Const. art. VI, § 2.

But, under the doctrine of federalism, states may provide greater protections for the "stability and security of Indian tribes and families," 25 U.S.C. § 1902, under their own child custody laws than are mandated by ICWA. *See Danforth v. Minnesota,* 552 U.S. 264, 308, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008) (Roberts., C.J., dissenting) ("principles of federalism protect the prerogative of States to extend greater rights under their own laws than are available under federal law."); *cf. Kahn v. Griffin,* 701 N.W.2d 815, 828 (Minn.2005) ("It is now axiomatic that we can and will interpret our state constitution to afford greater protections of individual civil and political rights than does the federal constitution."). Thus, by interpreting section 1911(b) to preclude states from protecting greater rights of self-determination, the majority's reading is not only unsupported by ICWA's plain language, it also undermines the basic elements of the doctrine of federalism.

For all the foregoing reasons, I conclude that the language of ICWA "as a whole" is not ambiguous and does not preclude transfer of any Indian child custody proceeding to tribal courts.[10]

---

9. The Supreme Court also relied heavily on the full language of ICWA to interpret one of the statute's specific provisions. In *Holyfield,* the Court concluded that it was evident from the "very text" of ICWA that Congress passed the statute to protect tribal jurisdiction over child custody matters. *Holyfield,* 490 U.S. at 44, 109 S.Ct. 1597. As the court explained, "Congress was concerned with rights of Indian families and Indian communities vis-à-vis state authorities. More specifically, [ICWA']s purpose was, in part, to make clear that in certain situations the state courts did *not* have jurisdiction over child custody proceedings." *Id.* at 45, 109 S.Ct. 1597. In a footnote, the Court continued, "This conclusion is inescapable from a reading of the *entire statute,* the main effect of which is to curtail state authority. See especially §§ 1901, *1911–1916,*

1918." *Id.* at 45 n. 17, 109 S.Ct. 1597 (emphasis added).

10. Even if we were to find some ambiguity in the language of the Act, we would still be compelled to reach the same result under two important canons of statutory construction.

First, "as has been repeatedly recognized by the United States Supreme Court, 'statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians.'" *State v. Forge,* 262 N.W.2d 341, 347 (Minn.1977) (quoting *Alaska Pac. Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918)). Courts have recognized this "rule of construction" for more than 200 years. *See Choate v. Trapp,*

## III.

The majority rejects the conclusion that "congressional policy regarding Indian tribes and families is not served by keeping a preadoptive placement proceeding in [s]tate court." Under the majority's view, it is not necessary to allow for the transfer of preadoptive or adoptive placement proceeding to tribal court because "ICWA establishes certain preferences [in state court proceedings] for the placement of Indian children in foster and adoptive homes." *See* 25 U.S.C. § 1915(b). This view ignores the intent of ICWA by continuing to allow "Anglo cultural biases into the picture," defeating "the very purpose for which ... ICWA was enacted." *Yavapai–Apache Tribe v. Mejia*, 906 S.W.2d 152, 170 (Tex.App.1995).

It is critical that we all understand that ICWA is about more than simply creating preferences in state courts; the intent behind ICWA was to reorient the relationship between states and sovereign Indian tribes and establish a preference for tribal—not state—jurisdiction over child custody disputes involving Indian children. *See* 25 U.S.C. § 1901(5); *see also Holyfield*, 490 U.S. at 45, 109 S.Ct. 1597 ("Congress perceived the States and their courts

as partly responsible for the problem it intended to correct [by passing ICWA].") As Chief Calvin Isaacs of the Mississippi Band of Choctaw Indians explained in testimony to Congress, "[p]robably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships." *1978 Hearings, supra,* at 193. ICWA was not intended merely to ensure that more Indian children ended up in Indian homes. Rather, it was a recognition that the fate of Indian tribes is tied to their own self-determination. *See Holyfield*, 490 U.S. at 49, 109 S.Ct. 1597 (stating that along with ICWA's other substantive provisions, "§ 1911(b) ( [establishing] presumptive jurisdiction over nondomiciliaries) ... must ... be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves").

## IV.

In my view, ICWA establishes in tribal courts concurrent jurisdiction with state courts for all child custody proceedings involving Indian children not domiciled or residing on their tribe's reservation. *See*

224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912) (rule has been applied "without exception, for more than 100 years").

Second, we construe statutes to "avoid absurd results and unjust consequences." *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 278 (Minn.2000). Here, the majority's interpretation of section 1911(b) creates an illogical dichotomy for child custody proceedings under ICWA. Congress understood that "the States, exercising their recognized jurisdiction over Indian child custody proceedings ... have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(4). Yet, under the majority's reading of section 1911(b), nondomiciliary · Indian children can only enjoy the enhanced levels of insight and cultural awareness provided by a

tribal court if a state juvenile court transfers the case before the conclusion of a termination of parental rights proceeding. As soon as the termination proceeding is completed, the state court can no longer transfer the case. A transfer that had been *mandatory* (except in limited circumstances) before the termination of parental rights proceeding instantly becomes *absolutely forbidden*. Thus, under the majority's interpretation, preadoption placement and adoption placement disputes will be "compelled to remain in the state court system with its recognized limitations, even when—as in this case—the county, the child's tribe, and the state juvenile court all agree that the child custody proceedings should advance in tribal court." Br. ICWA Law Center as Amicus Curiae Supporting Respondents at 13.

*T.T.B.*, 724 N.W.2d at 305; *cf. In re Guardianship of D.L.L. & C.L.L.*, 291 N.W.2d 278, 281 (S.D.1980) ("Even when a tribal member is off the reservation, tribal courts provide the appropriate forum for settlement of disputes over personal and property interests of Indians that arise out of tribal relationships." (citing *Fisher v. Dist. Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959))). Rather than placing a ceiling or cap on the power of state courts above which tribal authority may not extend, 25 U.S.C. § 1911 establishes specific guidelines for jurisdiction in child custody proceedings and a floor below which tribal authority may not fall. Put differently, section 1911 creates a floor, not a ceiling, for tribal jurisdiction in Indian child custody proceedings.

As previously noted, I find no ambiguity in the statutory structure of ICWA. Instead, I find clarity, direction, and purpose.[11] ICWA is a mandate to states: state law must prioritize tribal jurisdiction over state jurisdiction in Indian child custody proceedings. In such proceedings involving a child who resides or is domiciled within the reservation, ICWA protects absolute tribal authority by requiring exclusive jurisdiction for tribal courts. *See* 25 U.S.C. § 1911(a). A state is not permitted to interfere with federal protection of this sovereign power. *See* U.S. Const. art. VI, § 2.

In state court proceedings for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation, ICWA protects the tribal right of self-determination by *compelling* state courts to utilize a heightened standard for a denial of transfer to tribal court. *See* 25 U.S.C.

§ 1911(b). Under this provision, a state court is free to provide a higher level of protection in such proceedings, but may not eliminate the preference for tribal jurisdiction. Finally, in all other child custody proceedings—including the matter before the court today—a state court *may* but is not compelled to grant a transfer to tribal court. The fact that preadoptive and adoptive proceedings are not mentioned in section 1911(b) simply means that Congress did not require states to provide a heightened standard for denial of transfer in those proceedings.

At this point I note that my reading of ICWA is also supported by analogy to other courts' interpretations of one of section 1911's other subsections. For example, in *In re J.R.S.*, the Alaska Supreme Court first concluded—using language similar to what the majority use here—that 25 U.S.C. § 1911(c) "itself does not give a tribe the right to intervene in an adoption proceeding" because the section "distinguishes between 'adoptive placement' and 'termination of parental rights'" proceedings and supports intervention only in the latter. 690 P.2d 10, 15 (Alaska 1984) (quoting 25 U.S.C. § 1911(c)). But the Alaska court went on to conclude that ICWA "does not limit a state court's power to allow intervention in child custody proceedings." *Id.* at 16. The Alaska court explained:

[N]either the Act nor its legislative history establishes the ... position the adoptive parents present: that Congress implicitly forbade state courts to allow tribes to intervene in adoptive proceedings. We accept for purposes of argument that Congress has this power, but can ascertain no evidence that it has chosen to exercise it. [ICWA] does not purport to restrict state courts' authori-

---

11. Contrary to the majority's characterization, I do not ascribe to Congress any "mis-

take in draftsmanship" for section 1911(b) or any other ICWA provision.

ty to allow intervention.... On this question we do not think § 1911(c) offers any guidance. We therefore conclude that the Indian Child Welfare Act does not limit a state court's power to allow intervention in child custody proceedings.

*Id. See also In re Appeal in Maricopa Cnty. Juvenile Action No. A–25525*, 136 Ariz. 528, 667 P.2d 228, 233 (Ariz.Ct.App. 1983) ("Although [ICWA] explicitly provides a tribe with the right to intervene [only] in foster care and termination proceedings, it does not preclude a trial court from exercising its discretion in allowing intervention by a tribe in an adoption proceeding." (internal citation removed)); *In re Baby Boy C*, 27 A.D.3d 34, 805 N.Y.S.2d 313, 329 (N.Y.App.Div.2005) ("Many courts have held that although ICWA does not provide a statutory right of intervention, neither does it prohibit intervention under applicable state law.").

## V.

One final thought is in order before I end my dissent in this very important case. It is neither my province nor my preference to indicate whether state courts *should*, as the district court did here, transfer preadoption or adoption placement proceedings to a tribal court. In some cases, it will be appropriate for a state court to deny a transfer to tribal court. But the law says that tribal courts share concurrent jurisdiction in all cases involving Indian children—whether domiciled on their tribe's land or not—and therefore a transfer to tribal court must be available. *See* Patrice H. Kunesh, *Borders Beyond Borders—Protecting Essential Tribal Relations Off Reservation Under the Indian Child Welfare Act*, 42 New Eng. L.Rev. 15, 78 (2007) (explaining that the power of tribes to adjudicate child custody matters "derives from a source independent of the land," and there are thus "no real boundaries to protecting ...

essential tribal relations where the exercise of tribal authority is vital to the maintenance of tribal identity and self-determination").

The majority's assumption that state courts will closely adhere to ICWA's stated preference for child placement in preadoption and adoption proceedings appears hopeful at best. State courts from around the country have found ICWA confusing and frustrating, or they have simply chosen to ignore its prescriptions. Here in Minnesota, the goals of ICWA remain unfulfilled. *See T.T.B.*, 724 N.W.2d at 310 (Page, J., dissenting). "[A] report from this court suggests not only that Native-American children continue to be disproportionately placed out of home, but also that the number of such out-of-home placements is increasing." *Id.* (citing Minnesota Supreme Court, *Minnesota's Court Performance in Child Protection Cases: A Reassessment Under the Federal Court Improvement Program* 24 (Dec.2005)).

As previously noted, the provisions concerning jurisdiction are "[a]t the heart of [ICWA]." *Holyfield*, 490 U.S. at 36, 109 S.Ct. 1597. In ICWA, Congress "established a policy of preferring tribal control over custody decisions affecting tribal members." *BIA Guidelines*, 44 Fed.Reg. at 67,592. Here, "[t]he majority refuses to confront and grapple with the reality that there can be significant and possibly irreparable harm that is inflicted on Indian children, Indian families, and Indian tribes when Indian tribes are wrongfully deprived of their rightful jurisdiction to determine custody disputes involving Indian children." *In re Adoption of S.S. & R.S.*, 167 Ill.2d 250, 212 Ill.Dec. 590, 657 N.E.2d 935, 948 (1995) (McMorrow, J., dissenting). By denying transfer to tribal court in this Indian child custody case, the majority establishes a precedent that places Minnesota on a path toward the very ills that Congress intended to cure with ICWA. It

is long past time that this court's jurisprudence began to recognize and build upon the capacities and insights of the Indian people. Both as a matter of justice and as a matter of enlightened social policy, we must begin to act on the basis of what the Indians themselves have long been telling us: the future of Indian children is best determined by Indian acts and Indian decisions.[12]

For all of the foregoing reasons, I would affirm the decisions of both the district court and the court of appeals.

PAGE, J. (dissenting).

I join in the dissent of Justice Paul H. Anderson.

12. While ICWA's legislative history is not essential to my conclusions, I do want to note that the Act's history further confirms Congress's desire to vest in tribal courts the right to make child custody determinations for Indian children. Congress rejected an earlier version of the bill—Senate Bill 1214—that made tribal court jurisdiction over child custody cases involving nondomiciliary Indian children dependent on the existence of "significant contacts" between the child and his or her Indian tribe. S. 1214, P.L. 95–608, 95th Cong. (1978). Under the Senate version, in the absence of significant contacts, the tribal court could not gain jurisdiction over any child custody proceedings except "temporary placements." *Id.* at § 102(c). But once the state court found significant contacts, it was *required to* transfer *all child custody* proceedings to the tribal court "unless good cause for refusal [was] affirmatively shown." *Id.* (stating "jurisdiction shall be transferred" in the absence of good cause).

The House's version of the bill—the bill eventually adopted by Congress without changes—eliminated the "significant contacts" requirement. By passing the House version of the bill, Congress indicated its preference for tribal jurisdiction in all child custody cases, including those involving nondomiciliary Indian children. *See S.S. & R.S.*, 212 Ill.Dec. 590, 657 N.E.2d at 951–52 (McMorrow, J., dissenting) (explaining that the legislative history of ICWA reveals congressional intent to expand, not contract, tribal court jurisdiction). As one commentator explained, "the Native American sovereign, which appeared as a minor player in the original Senate plan, secured a major role in the final Act." Carriere, *supra*, at 609. Under the majority's interpretation of ICWA, however, a child custody proceeding that could have been transferred to tribal court under the original Senate version of the bill cannot be transferred under the rewritten House bill that was intended to empower tribal courts. The reading is irreconcilable with the statutes legislative history.